IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL WOODS, RAMONA WOODS,       )
and BNT AD AGENCY, LLC,            )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )        1:14CV767
                                   )
CITY OF GREENSBORO, TONY           )
WILKINS, NANCY HOFFMAN,            )
NANCY VAUGHAN, ZACK MATHENY,       )
MARIKAY ABUZUAITER, and            )
T. DIANNE BELLAMY-SMALL,           )
                                   )
            Defendants.            )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

      Presently before this court are Motions to Dismiss filed by
Defendant City of Greensboro ("the City") (Doc. 10), and several
current and former members of the Greensboro City Council Tony
Wilkins, Nancy Hoffman, Nancy Vaughan, Zack Matheny, Marikay
Abuzuaiter, and T. Dianne Bellamy-Small ("City Council
Defendants") (collectively "Defendants"). (Doc. 12.)  Plaintiffs
Michael Woods, Ramona Woods, and BNT Ad Agency, LLC
("Plaintiffs") have filed responses (Docs. 22, 23) to
Defendants' motions, and Defendants have replied (Docs. 25, 26).
These matters are now ripe for resolution, and for the reasons
stated herein, Defendants' Motions to Dismiss will be granted.

## I.   BACKGROUND

Sometime in April of 2013, Plaintiffs entered into discussions with various officials for Defendant City of Greensboro regarding the creation of a minority-owned television network, and the benefits that such a network would bring to the City.  (Amended Complaint ("Am. Compl.") (Doc. 5) ¶ 15.)[1]  At some point in the discussions, the City recommended that Plaintiffs submit an application for a ten-year, $300,000.00 economic development loan to help fund the project. (Id. ¶ 18.) Plaintiffs' loan was to be secured by a lien on the personal residence of Plaintiffs Michael and Ramona Woods, which was appraised on May 28, 2013, at a value of $975,000.00, "resulting in equity well over the $300,000.00 loan, after consideration of

---

[1] All citations in this Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

all existing loans on the residence."[2]  (Id. ¶¶ 20-21.)  On

June 18, 2013, the City Council voted 7 to 2 in favor of

authorizing the City to enter into a loan agreement with

Plaintiffs.  (Id. ¶ 22.)  This Resolution ("the June 18

Resolution") was drafted with a condition stating that the

---

[2] Although not relied upon in this court's analysis or
holding, the Amended Complaint alleges a loan to be secured by
Plaintiffs' residence.  However, the Resolution passed by the
City Council, which Plaintiffs have requested that this court
consider, states that the loan will be secured by no more than a
second lien on property located at 1325 South Eugene Street.
(Br. in Supp. of Mot. to Dismiss of Def. City of Greensboro and
Individual Defs. in their Official Capacity ("City's Br."),
Ex. A (Doc. 11-1) at 12.) The Resolution also states that a
"production studio" is located at 1325 South Eugene Street, and
does not identify a personal residence.  (Id. at 11.)  As noted
below, Plaintiffs contend that the address is an error, and that
the Resolution should contain a Carlson Dairy Road address.
Assuming the South Eugene Street property is in fact a personal
residence of the Woods for purposes of consistency with the
Amended Complaint, the Resolution further states that the
"[c]urrent mortgage debt outstanding is $1,179,348," (id. at
12), as compared to the Amended Complaint, which is silent as to
the address of the property that might be used to secure the
loan but indicates a value of "975,000.00, resulting in equity
well over the $300,000.00 loan." (Am. Compl. (Doc. 5) ¶ 21.)  It
is unclear to the court whether the mortgage debt listed in the
Resolution refers to the property at South Eugene Street or the
property on Carlson Dairy Road. Either this is an additional
discrepancy between the Amended Complaint and the Resolution, or
the City obtained financial information on a property that was
not intended as security for the loan, which belies the notion
that this listed address was merely typographical error. Even
assuming that Plaintiffs' allegations are true and drawing all
reasonable inferences in favor of Plaintiffs, the factual
discrepancies between the allegations and the terms of the
Resolution further support this court's finding hereinafter that
a contract was not formed.

- 3 -

City's loan would be secured by "no more than a second lien" on the property. (Id. ¶ 26.) At some point after it was approved, Plaintiffs allege that they were informed that the June 18 Resolution would have to be amended to reflect that the City's interest would be a third lien, rather than a second, as there were in fact already two liens on the home. (Id. ¶ 25.) Plaintiffs allege that they were under the impression that the amendment would be no more than perfunctory, but on July 16, 2013, the City Council rejected the proposed amendment based on its unwillingness to take a third-place interest to secure the loan, which Plaintiffs allege was pretext. (Id. ¶ 29.)

Plaintiffs filed suit alleging violations of sections 1981, 1983, and 1986 of the Civil Rights Act of 1866 as they relate to the Equal Protection and Due Process clauses of the 14th amendment as well as the North Carolina Constitution, and claims for breach of contract, civil conspiracy, and unfair and deceptive trade practices.[3] (Am. Compl. (Doc. 5) at 6-15.) Plaintiffs allege that Defendants denied the proposed loan term

---

[3] Plaintiffs have since dropped their claim for unfair and deceptive trade practices (Sixth Cause of Action), and as such, this court will dismiss that claim without further discussion. (See Plaintiffs' Opp'n Br. to City Council Defendants' Mot. to Dismiss ("Pls.' Opp'n Br. to City Council Defs.' Mot. to Dismiss") (Doc. 23) at 11.)

modification based on Plaintiffs' race and breached the contract
allegedly entered into, in violation of the 14th amendment and
North Carolina Constitution, as well as state law.

## II.  **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,
550 U.S. 544, 570 (2007)).  A claim is facially plausible
provided the plaintiff provides enough factual content to enable
the court to reasonably infer that the defendant is liable for
the misconduct alleged.  Id.  The pleading setting forth the
claim must be "liberally construed" in the light most favorable
to the nonmoving party, and allegations made therein are taken
as true.  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).
However, the requirement of liberal construction does not mean
that the court can ignore a clear failure in the pleadings to
allege any facts [that] set forth a claim." Estate of Williams-
Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d
636, 646 (M.D.N.C. 2004).

Rule 12(b)(6) protects against meritless litigation by
requiring sufficient factual allegations "to raise a right to

relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." <u>Twombly</u>, 500 U.S. at 555, 570; <u>see</u> <u>Iqbal</u>, 556 U.S. at 680. Under <u>Iqbal</u>, the court performs a two-step analysis. First, it separates factual allegations from allegations not entitled to the assumption of truth (i.e., conclusory allegations, bare assertions amounting to nothing more than a "formulaic recitation of the elements"). <u>Iqbal</u>, 556 U.S. at 681. Second, it determines whether the factual allegations, which are accepted as true, "plausibly suggest an entitlement to relief." <u>Id.</u> "At this stage of the litigation, a plaintiff's well-pleaded allegations are taken as true and the complaint, including all reasonable inferences therefrom, are liberally construed in the plaintiff's favor." <u>Estate of Williams-Moore</u>, 335 F. Supp. 2d at 646.

## III. <u>ANALYSIS</u>

As an initial matter, the City Council Defendants contend that Plaintiffs' allegations should be dismissed as to them individually on all counts because, under the doctrine of legislative immunity, they are absolutely immune from suit.

(See City Council Defs.' Br. in Supp. of Mot. to Dismiss (Doc. 13) at 6-12.) This court agrees.

The principle of legislative immunity "has long been recognized . . . and was 'taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation.'" See Bogan v. Scott-Harris, 523 U.S. 44, 48-49 (1998) (citing Tenney v. Brandhove, 341 U.S. 367, 372 (1951)). Under this principle, absolute immunity from suit will attach to "all actions taken in the sphere of legitimate legislative activity." Bogan, 523 U.S. at 54 (internal quotations marks omitted). Whether or not an act is considered "legislative" for purposes of immunity turns on the act itself, not the motive or intent of the official performing it. Id.

The Fourth Circuit, following the First and Fifth Circuits, has adopted a test to determine whether or not an act is considered "legislative." See Alexander v. Holden, 66 F.3d 62, 66 (4th Cir. 1995). This test focuses on the "'nature of the facts used to reach the . . . decision'" and the "'particularity of the impact of the state of action.'" Id. (citing Acevedo-Cordero v. Cordero-Santiago, 958 F.2d 20, 23 (1st Cir. 1992); Hughes v. Tarrant Cty. Tex., 948 F.2d 918, 921 (5th Cir. 1991)). Under this test, if the underlying facts relate to particular

- 7 -

individuals or situations, and the decision impacts specific
individuals or singles out specific individuals, the decision is
administrative, and not entitled to legislative immunity.
Alexander, 66 F.3d at 66 (internal quotations and citations
omitted). However, if the facts involve generalizations
concerning a policy or state of affairs, and the establishment
of a general policy affecting the larger population, then the
action is legislative, and entitled to absolute immunity. Id.[4]
Notably, an act can still be legislative if it affects only an
individual, and the inquiry turns on the nature of that act.

---

[4] Although this court can find no cases in the Fourth
Circuit directly on point, in San Pedro Hotel Co. v. City of
L.A., 159 F.3d 470 (9th Cir. 1998), the Ninth Circuit found that
legislative immunity attached on a similar set of facts, where a
City Councilman had both voted against and failed to recommend
that a loan of public funds to a business be approved by the
Council. Id. at 473-74. Applying a test similar to the one
used by the Fourth Circuit, the Ninth Circuit inquired as to
"(1) whether the act involve[d] ad hoc decisionmaking, or the
formulation of policy; and (2) whether the act applies to a few
individuals, or to the public at large." Id. at 476 (internal
citations and quotations omitted). The court held that "voting
or persuading his colleagues to vote one way or another on
approval" of the loan involved "the formation of public policy
applied to the public at large." Id. The Court explained that
because the use of public funds in support of a particular
project "necessarily means that other projects are not being
funded," that "a legislator's decision can almost always be
criticized for not funding some worthy group," and that such
actions were "precisely the type of decision for which a
legislator must be given immunity." Id.

- 8 -

Compare Roberson v. Mullins, 29 F.3d 132 (4th Cir. 1994)
(terminating single county employee not a legislative act), with
Whitener v. McWatters, 112 F.3d 740 (4th Cir. 1997)
(disciplining single member of County Board of Supervisors was
legislative act).

Here, the Amended Complaint alleges that the City Council
passed a Resolution authorizing the City to loan money and
refused to pass another modifying the terms originally
authorized. City Council Resolutions must be passed by majority
vote and are a quintessentially legislative action that
implements city policy.  See Bogan, 523 U.S. at 55-56 (1998)
(finding an activity legislative where it "reflected a
discretionary, policymaking decision implicating the budgetary
priorities of the city and the services the city provide[d] to
its constituents"). Further, as reflected in the City Council

Meeting Minutes from June 18, 2013,[5] in initially adopting the
Resolution approving the loan terms, the City Council considered
both that there was "a limited amount of city funding
[available] for loans," and "expressed concerns about
establishing a precedent of loaning public funds to businesses."
(City's Br., Ex. A (Doc. 11-1) at 11.)  According to the Meeting
Minutes from July 16, 2013, which contain discussion of the
decision to reject the Resolution amending the closing
conditions for the loan, the City Council discussed "three
previous loans where the City had been in the third position,"
"concerns [] about the City going from second to the third
position in loan repayment," and "the desire to support minority
owned small businesses." (Id., Ex. C (Doc. 11-3) at 36.)

---

[5] Defendants, in moving to dismiss, have included the City
Council Meeting Minutes and two Resolutions at issue and suggest
they may be considered without converting the motion to one for
summary judgment. (See City's Br. (Doc. 11) at 3-4 and nn.3-4.)
Plaintiffs do not oppose this court's consideration of those
documents and join in the request that this court consider them.
(Pls.'s Br. in Opp'n to Mot. to Dismiss of Def. City of
Greensboro and Individual Defs. in their Official Capacity
("Pls.' Opp'n Br. to the City's Mot. to Dismiss") (Doc. 22) at 9
n.1.)  The court may take judicial notice of the City Council's
Meeting Minutes in its analysis of the present motion to dismiss
without converting the motion into one for summary judgment. See
Locklear v. Town of Pembroke, No. 7:12-CV-201-D, 2012 WL
6701784, at *2 (E.D.N.C. Dec. 26, 2012); aff'd, 531 Fed. App'x
379 (4th Cir. 2013); Roberson v. City of Goldsboro, 564 F. Supp.
2d 526, 527 n.1 (E.D.N.C. 2008); Whitesell v. Town of
Morrisville, 446 F. Supp. 2d 419, 423-24 (E.D.N.C. 2006).

Plaintiffs' Amended Complaint alleges no facts regarding the nature of either meeting, other than that Plaintiffs were "under the reasonable impression and led to believe that the purpose of the special meeting by the City Council was perfunctory in nature and solely for the purpose of correcting language in the Resolution."  (Am. Compl. (Doc. 5) ¶ 28.)

Applying the test laid out by the Fourth Circuit, it seems clear to this court that the City Council was concerned with general public policy surrounding the use of funds in passing the Resolution which rejected amending the closing terms of the loan.  The City Council's discussion encompassed both the desire to support minority owned small businesses in Greensboro, the limited amount of public funds available for loans, and the concern over establishing a precedent of loans of public funds to private businesses, all of which are broad policy concerns. Given the Council's concern over the limited availability of funds and the competing policy goals, hesitation over the City's lien priority status seems directed towards ensuring a successful deployment of city resources, rather than concern over Plaintiffs' credit status. See Bryant v. Jones, 575 F.3d 1281, 1306 (4th Cir. 2009) (explaining that "discretionary, policymaking decision[s] implicating the budgetary priorities of

the city" are legislative acts). While it is true that the refusal to modify did directly affect a small group, this court is persuaded that this consideration is not dispositive of the matter. See Acierno v. Cloutier, 40 F.3d 597, 612-13 (3d Cir. 1994) (holding that actions of a county legislature that affected a single parcel of land, and a single owner, were legislative).

Because it finds that the City Council's act was based on broader, policy based concerns, and not the individual facts of Plaintiffs' situation, this court finds that it was a legislative act, and as such, that the City Council Defendants are entitled to legislative immunity. As the Ninth Circuit stated in San Pedro, to hold otherwise "would expose virtually every municipal funding decision to judicial review." San Pedro Hotel Co., 159 F.3d at 476; see also Cmty. House, Inc. v. City of Boise, 623 F.3d 945, 961 (9th Cir. 2010) ("Budgetary decisions . . . typically involve the formation of policy."). Because the City Council Defendants are entitled to absolute immunity, this court will grant their motion to dismiss in its entirety.

A. **The City of Greensboro**

Plaintiffs have also brought their claims against the City of Greensboro.[6] The alleged causes of action include a violation of their equal protection rights under 42 U.S.C. §§ 1981 and 1983 (First Cause of Action); a § 1983 due process claim (Second Cause of Action); a § 1986 claim (Third Cause of Action); a breach of contract claim (Fourth Cause of Action); a claim for civil conspiracy (Fifth Cause of Action); and a claim for unfair and deceptive trade practices (Sixth Cause of Action). (Am. Compl. (Doc. 5) at 6-15.) Because this is a motion to dismiss, the non-conclusory allegations contained in the Amended Complaint are taken as true. The court will address each cause of action in turn.

i. **Breach of contract claim (Count Four)**

Because the allegations that the City "reneged on its loan approval," (see Am. Compl. (Doc. 5) ¶ 29), and breached the loan

---

[6] This court finds that Plaintiffs' claims against the City Council Defendants in their official capacities are duplicative of those against the City of Greensboro. See Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for . . . local government units can be sued directly for damages and injunctive or declaratory relief."). As such, this court will only address the claims against the City.

contract are central to this case, this court will address those allegations first.[7]

The City's primary contention is that this cause of action should be dismissed because there was no contract between the City and Plaintiff BNT Ad Agency ("BNT"). (City's Br. (Doc. 11) at 7.) The City argues that Resolution 172-13, the June 18 Resolution, simply authorized the City to execute the needed note and agreement with BNT according to the provisions set out in the Resolution. As the note and agreement were never executed, the City contends that no contract was ever formed. (Id. at 8.)

It does not appear there is any dispute with respect to the terms of the Resolution passed by the City Council, as Plaintiffs concede that the Resolution as passed required that any loan be secured by a second position lien. (Am. Compl. (Doc. 5) ¶ 26.) Instead, Plaintiffs point to language in the Resolution detailing conditions that would constitute a default, and argue that "a contract and loan existed as no default could occur otherwise and that these conditions were not in fact

_____

[7] Plaintiffs' use the term "renege" to describe the failure of the City to make a loan to Plaintiffs. That term, while perhaps of some descriptive value, does not, in and of itself, state or support a legal claim. The failure to perform pursuant to a valid contract constitutes a breach of that contract.

- 14 -

conditions precedent." (Pls.' Opp'n Br. to City Council Defs.'
Mot. to Dismiss (Doc. 23) at 10-11.) This court finds that
Plaintiffs have failed to plausibly allege the existence of a
contract creating a duty to advance the funds for a loan.

In order to allege a breach of contract claim, Plaintiffs
must first allege the existence of a valid contract. Poor v.
Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A valid
contract is formed when two parties manifest an intent to be
bound. Parker v. Glosson, 182 N.C. App. 229, 232, 641 S.E.2d
735, 737 (2007) (citing Croom v. Goldsboro Lumber Co., 182 N.C.
217, 220, 108 S.E. 735, 737 (1921)). A contract does not exist
if "one party simply believes that a contract exists, but there
is no meeting of the minds." Elliott v. Duke Univ., Inc., 66
N.C. App. 590, 595, 311 S.E.2d 632, 636 (1984) (citing Brown v.
Williams, 196 N.C. 247, 145 S.E. 233 (1928)). Furthermore, the
terms of a contract must be "definite and certain or capable of
being made so" such that the parties "assent to the same thing,
in the same sense." Horton v. Humble Oil & Refining Co., 255
N.C. 675, 679, 122 S.E.2d 716, 719 (1961) (internal quotation
marks and citations omitted).

This court finds that Plaintiffs' claim for breach of
contract does not plausibly allege a meeting of the minds, see

Elliott, 66 N.C. App. at 595, nor do the allegations establish definite and certain terms, see Horton, 255 N.C. at 679.

As a preliminary matter, this court observes that Plaintiffs allege the Resolution contained an error, that is, the fact that the mortgage lien would hold a second position on the property. (Am. Compl. (Doc. 5) ¶ 25.)  Plaintiffs also argue that the Resolution should have required a mortgage lien on Plaintiffs' residence (5018 Carlson Dairy Road), instead of the 1325 South Eugene Street address. (Pl.'s Opp'n Br. to the City's Mot. to Dismiss (Doc. 22) at 5.)  Under these circumstances, Plaintiffs' own pleadings establish there was no meeting of the minds as to the Resolution.  Nonetheless, Plaintiffs attempt to frame their breach of contract claim more broadly than simply breach of the Resolution itself.

The allegation most suggestive of a contract in the Amended Complaint is that "Defendant Greensboro subsequently suggested and recommended that Plaintiff BNT submit an application for a loan and agreed to assist Plaintiff BNT in framing an application for a $300,000.00 ten year, economic development loan for presentation to the City Council." (Am. Compl. (Doc. 5) ¶ 18.) However, even taking this as true, at most, the City agreed to assist "in framing an application," and

- 16 -

apparently did so, as a Resolution was later submitted to the City Council.[8] Plaintiffs allege that following the submission of the Resolution, the "$300,000.00 loan to Plaintiff BNT was approved by Defendant Greensboro at the June 18, 2013 meeting of the Greensboro City Council." (Id. ¶ 22). Plaintiffs go on to allege the following:

> 25. Following the June 18, 2013 City Council vote, it was brought to the Plaintiffs' attention that the Resolution drafted would have to be amended to reflect that Defendant Greensboro's security interest would be a third-position lien rather than a second-position lien security interest.

> 26. Plaintiff BNT and the Plaintiffs Michael and Ramona Woods were informed that this amendment was required because the Resolution initially drafted by the Greensboro City Attorney's office stated that the loan would be secured by a note and deed of trust with Defendant Greensboro's interest secured by "no more than a second lien" on the real property and improvements.

> 27. The Resolution was drafted, despite the fact that, prior to placing the loan on the June 18, 2013 agenda, Defendant Greensboro had full details regarding the amount and nature of the liens against the Plaintiffs' residence, including the fact that there was already a first and a second lien against the property.

---

[8] To the extent that Plaintiffs are alleging that the actions of various City "officials" constituted actions that bound the City to a contract, (see Am. Compl. (Doc. 5) ¶¶ 15-19), they are incorrect, as only a vote of the City Council can bind the City to a contract. See Greensboro, N.C., Charter, Ch. IV, Subch. D, art. 1, § 4.111 (2011) ("All contracts . . . shall be authorized and approved by the Council and reduced to writing in order to be binding upon the City.").

(Id. ¶¶ 25-27.)

As the June 18 Resolution makes clear, "[BNT was] required to confirm compliance with the [conditions of the loan] prior to the City's loan closing to protect the public funds invested in the project." (City's Br., Ex. B (June 18 Resolution) (Doc. 11-2) at 1 (emphasis added).)

As noted above, a contract does not exist if "one party simply believes that a contract exists, but there is no meeting of the minds." Elliott, 66 N.C. App. at 595, 311 S.E.2d at 636 (citing Brown v. Williams, 196 N.C. 247, 145 S.E. 233 (1928)). Taking the allegations in the light most favorable to Plaintiffs, the most that has been plausibly alleged is that Plaintiffs themselves believed that a contract existed. Taking the facts alleged in the pleading and the June 18 Resolution together, Plaintiffs were required to confirm that the City would be placed into a second-position lien interest on the property before a loan contract could be entered into with the City. According to the allegations, Plaintiffs were either unable or unwilling to provide a second position lien, as "there

- 18 -

was already a first and a second lien against the property."

(Am. Compl. (Doc. 5) ¶ 27.)[9]

Nonetheless, Plaintiffs conclude the factual section by alleging:

> Notwithstanding all of the prior assurances made on June 18, 2013 and thereafter, Defendant Greensboro reneged on its loan approval at a July 16, 2013 City Council meeting, using as a pretext, that it was not willing to take a third-position security interest rather than a second-position security interest.

(Id. ¶ 29.)  Like the other allegations, this allegation falls short of plausibly establishing a meeting of the minds necessary to formation of a contract.  The Amended Complaint fails to allege any facts that establish that an agreement was reached as to the terms that were required for the loan contract.  As such, an allegation of the City's "prior assurances" simply relates to the suggestions and encouragement by the City established

---

[9] Plaintiffs allege that the City "had full details regarding the amount and nature of the liens against the Plaintiffs' residence, including the fact that there was already a first and a second lien against the property." (Am. Compl. (Doc. 5) ¶ 27.) Even taking that allegation as true, the Resolution as drafted clearly reflects that the City required a second lien position before the loan contract could close. (City's Br., Ex. B (June 18 Resolution) (Doc. 11-2) at 1.) Thus, the City's knowledge of the various liens on the property notwithstanding, the City's intent was apparently not to enter into a contract until it could obtain a second-place lien.

- 19 -

earlier in the Amended Complaint, and not to the creation of a contract.

Finally, Plaintiffs' allegations that the City Council's actions in "approving the loan" by way of their Resolution created "a legally valid and enforceable mutual contract along with all attendant contractual obligations [that] existed between the parties," (id. ¶ 46), is nothing more than a legal conclusion unsupported by plausible facts.

As a result, this court finds that Plaintiffs have failed to plausibly allege the existence of a contract which was the subject of a breach. That claim will therefore be dismissed.

### ii. Equal Protection Claims (Count One)

Plaintiffs' claims under Count One are complex, but in summary, Plaintiffs allege they were denied a modification of the loan terms initially approved by the City Council in the June 18 Resolution because of their race. Plaintiffs allege that Defendants have violated their equal protection rights under sections 1981 and 1983 of the Civil Rights Act of 1866, as well as Article I, section 19 of the North Carolina Constitution by "fail[ing] to follow prescribed procedures related to the awarding and then reneging of Plaintiffs' loan approval." (Am. Compl. (Doc. 5) ¶ 38.)

As an initial matter, Plaintiffs Michael and Ramona Woods do not have standing to assert discrimination claims on the alleged facts. As the Supreme Court explains in Plaintiffs' cited case of Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006), "it is fundamental corporation and agency law . . . that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." Domino's, 546 U.S. at 477 (emphasis added). The Supreme Court went on to hold that non-parties to a contract cannot bring suit for violation of contracting rights under § 1981, because such non-parties have no rights in the contract that can be violated. Id.

It further appears that Plaintiff BNT may likewise lack standing to bring a racial discrimination claim. The Fourth Circuit has held that corporations that are "minority-owned and ha[ve] been properly certified as such under applicable law can be the direct object of discriminatory action and establish standing to bring an action based on such discrimination." Carnell Constr. Corp. v. Danville Redevelopment Hous. Auth., 745 F.3d 703, 715 (4th Cir.), cert. denied, ____ U.S. ____, 135 S. Ct. 357 (2014), and cert. denied, ____ U.S. ____, 135 S. Ct. 361 (2014). Here, while the Amended Complaint alleges that

Plaintiff BNT is "a minority-owned limited liability company . . . that acquired an imputed racial identity," (see Am. Compl. (Doc. 5) ¶ 34), it does not allege that BNT was certified as such under the law of North Carolina. The essence of Plaintiffs' argument on this front is that such a rule puts non-certified businesses like BNT and their owners between a rock and a hard place, whereby BNT has no racial identity to sue on, but the stockholders who do have no standing. This is a difficulty that other courts have recognized. See, e.g, Hudson Valley Freedom Theater, Inc. v. Heimbach, 671 F.2d 702, 706 (2d Cir. 1982). The Fourth Circuit, however, has held that "a corporation that is minority-owned and has been properly certified as such under applicable law can be the direct object of discriminatory action and establish standing to bring an action based on such discrimination." Carnell Constr. Corp., 745 F.3d at 715 (emphasis added). Thus, certification appears to be a requirement for standing in the Fourth Circuit. Here, Plaintiffs have failed to allege any facts pointing to certification as a historically underutilized business under North Carolina law, and as such do not have standing to bring suit.

However, even if Plaintiff BNT does in fact have standing to bring a racial discrimination claim, the Amended Complaint fails to plausibly allege such a claim.

The Supreme Court has made clear that claims of discrimination do not face a heightened pleading standard, but rather are subject to the normal standards of the Federal Rules of Civil Procedure. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002). Nevertheless, a pleading that offers only "naked assertion[s] devoid of further factual enhancement" is not enough. Iqbal, 556 U.S. at 678 (internal quotations omitted). Thus, when a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal citation omitted). Here, Plaintiffs' allegations fall short of plausibility, and as such do not rise to the level where this court can reasonably infer that Defendants are liable for the alleged conduct.

Plaintiffs allege that Defendants "reneged upon and denied Plaintiffs' loan on an intentional discriminatory basis, while concocting the pretext that such loan was being denied due to a third-position security interest." (Am. Compl. (Doc. 5) ¶ 36.) Although, as stated above, there was no actual contract for

- 23 -

Defendants to renege upon, Plaintiffs argue in their briefing that even if a finalized contract was never entered into, the City Council's refusal to modify the Resolution terms to allow for a third-position lien is still an equal protection violation because it unjustly interfered with their right to "make and enter into contracts." (Pls.' Opp'n Br. to the City's Mot. to Dismiss (Doc. 22) at 12.) Given that it appears from the June 18 Meeting Minutes that the initial Resolution was approved in part <u>because</u> Plaintiffs are minorities, it is implausible that they were later <u>denied</u> a loan because of the same consideration. Thus the only possible plausible inference that Plaintiffs can make is that they were denied an amendment to the Resolution authorizing the modification, where non-minorities would have received one. (City's Br., Ex. A (Doc. 11-1) at 11.)

Plaintiffs make several allegations in support of this argument that the City Council's refusal to modify the loan terms was based upon discriminatory grounds and not the City's budget priorities. None of the allegations, however, suffice to push Plaintiffs' claims into the realm of plausibility such that this court can infer that Defendants denied the modification with discriminatory intent, rather than for the

non-discriminatory reason of maintaining the City's original security position.

First, Plaintiffs allege that the City refusing to accept a third-place lien is pretext because the City would have been fully secured regardless of its lien position, and that even so, Plaintiffs were "not . . . afforded the chance to consolidate" their liens and put the City into a second-place lien position. (Am. Compl. (Doc. 5) ¶ 37(c).) The second contention is inconsistent with the supporting documents, as both the minutes of the July 16 City Council meeting as well as a November 25, 2013 letter sent to Defendants from the City make clear that the original Resolution authorizing a loan with a second-place lien remained in effect. (See City's Br., Ex. C (Doc. 11-3) at 36; City's Reply. Br. to Mot. to Dismiss, Ex. B. (Doc. 26-2) at 4.) As such, the record suggests that Plaintiffs were free at any time to enter into the loan on the original terms.

Plaintiffs conclusorily contend that the City had full knowledge of the number of liens on the property, but it appears from both the City's letter and the July 16 Meeting Minutes that the exact nature of both the number and value of the security interests on the collateral at issue was not disclosed to the City Council until after the initial approval of the original

- 25 -

loan terms.[10]  The City Council required no less than a
second-place lien on the property (a position Plaintiffs do not
contend was discriminatory), _before_ it came to light that the
property was more encumbered and subject to more debt than
originally disclosed.  Thus, Plaintiffs are necessarily alleging
that, absent racial bias, the City would have been willing to
take a lower lien position than it originally required _after_

---

[10] Further, the June 18 Resolution reflects that a
requirement of the loan was that the City would "complete a
title search confirming no additional liens [were] outstanding
on the . . . property . . . beyond the first mortgage that is
currently outstanding." (City's Br., Ex. B (June 18 Resolution)
(Doc. 11-2) ¶ 2.)  Plaintiffs allege nothing explaining why this
requirement appears in the Resolution if the City already knew
of the second lien.  In addition, at the July 16 City Council
meeting, Defendant Ramona Woods is recorded as stating that "she
had not intended to not disclose her loan positions."  (Id.,
Ex. C (Doc. 11-3) at 36.)  While Plaintiffs may be alleging that
some employee of the City knew of the second lien, it seems
clear to this court from the facts provided that the City
Council Defendants, whose actions are those at issue, did not.
While it does not seem plausible that the City Council
Defendants or the City itself had this knowledge in light of the
language contained in the Resolution, even if taken as true,
that knowledge does not equate to a willingness to accept a
third position, nor does it suggest a contractual obligation on
the part of the City to accept a third position.  Finally, as
noted above, while some employee of the City may have been aware
of the mortgage and liens, it does not lead to the conclusion
that the City Council Members were aware of the financial
circumstances or were prepared to accept any specific conditions
that may have been desired by Plaintiffs.  This is particularly
true when the language of the Resolution itself is compared to
the allegations contained in the Amended Complaint.  (See City's
Br. (Doc. 11) at 2 n.1.)

discovering that it had not been provided full information, and that the collateral at issue was subject to more encumbrance and debt than originally disclosed.  This is not enough, on its own, to plausibly infer bias.

However, Plaintiffs also allege that the City has taken third-place liens with non-minority businesses before and provide examples of times when the City has allegedly been willing to modify its original financing requirements for non-minority businesses, even in the face of financial issues. (Am. Compl. (Doc. 5) ¶¶ 37(e-p).)

An equal protection claim essentially sounds in disparate treatment.  "'To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" Williams v. Hansen, 326 F.3d 569, 576 (4th Cir. 2003) (quoting Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001)); see also City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985) (The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated alike.).

In order to allege an equal protection violation by showing disparate treatment, Plaintiffs must allege "(1) that they were treated differently from others who are similarly situated, and (2) that such treatment was intentional or purposeful, based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Eberhart v. Gettys, 215 F. Supp. 2d 666, 675 (M.D.N.C. 2002) (internal quotation marks omitted). In looking to whether an alleged comparator is similarly situated for purposes of a racial discrimination claim, Plaintiffs must show that they are similar "in all relevant respects to their comparator." Haywood v. Locke, 387 Fed. App'x 355, 359 (4th Cir. 2010). As other courts have put it, the Court must be able to compare "apples to apples." Clark v. Boscher, 514 F.3d 107, 114 (1st Cir. 2008).

Many of the allegedly similarly situated businesses proffered by Plaintiffs are not valid comparators based on the allegations, as the facts pled involve either grant money, rather than loan money, City Council decisions that were made after a loan had already been disbursed, or a differently constituted City Council. (See id. ¶¶ 37(g-p).) This court cannot validly compare, for example, Plaintiffs' situation to

that of the Nussbaum Center for Entrepreneurship, because, as Plaintiffs allege, that decision involved the conversion of a loan of $1,275,000.00 into a grant, rather than a decision to modify a loan proposal's terms. (Id. ¶ 37(h).) The two situations involve different types of businesses, different monetary amounts, and different fiscal considerations. No plausible inference of disparate treatment may be drawn from any of these facts.

Further, the specific security position of the City is a financial decision that is not immediately subject to drawing inferences of racial discrimination within the context of minority small-business promotion. Plaintiffs specifically allege that "the City Council has approved prior loans to non African-American applicants where Defendant Greensboro's secured position was third." (Am. Compl. (Doc. 5) ¶ 37(c).) Absent comparable financial circumstances, such an allegation is insufficient to suggest that race was a factor in the City's decision. That same paragraph further alleges that "Plaintiffs were not offered or afforded the chance to consolidate the first mortgage . . . ." (Id.) In evaluating the plausibility of their allegations under these circumstances, it is significant that a loan was actually awarded to BNT at least in part to promote

- 29 -

minority businesses; the claim of disparate treatment is as to
the requirement of a second versus third-position lien to secure
the loan.  Other than the one year in which the City's
originally-approved loan remained outstanding, Plaintiffs fail
to allege, nor can this court infer, anything more that the City
could have done to effect the transaction and, more importantly,
how this suggests a racial motive.

Plaintiffs do allege that the City Council voted to give an
$850,000.00 loan to Kotis Holdings, a local developer, which was
secured by a third-place lien on a private residence.  (Id.
¶ 37(f).)  However, even assuming all of these facts to be true,
Plaintiffs have failed to allege facts that permit an inference
of discrimination.  In paragraph 37(f) of the Amended Complaint,
Plaintiffs allege that the City Council in January 2013 created
a new incentive program to give a local developer, Kotis
Holdings, an $850,000.00 loan.  The loan was guaranteed with a
third-lien position after the principals tied a personal
residence to the deal as collateral.  (Am. Compl. (Doc. 5) ¶
37(f).) These allegations are insufficient to raise an inference
of racial animus, even assuming that Kotis Holdings is "non-
African American or Hispanic in nature." (Id. ¶ 37(e).) First,
the allegations refer to "a new incentive program" to give Kotis

Holdings the loan, as compared to BNT's alleged application for "a $300,000.00 ten year, economic development loan." (Id. ¶ 18.) It is not clear that the programs, and thus the financial considerations, are the same. Second, it is not clear how the Kotis loan itself, made "after the principals tied a personal residence to the deal" compares to the loan applied for and approved to BNT. Finally, it appears from the allegations that the Kotis loan was <u>initially</u> secured with a third position, rather than initially secured with a second position, and later modified. Such a situation is different from that of the Plaintiffs.[11]

This court therefore finds that Plaintiffs have failed to allege facts which plausibly support an inference of Plaintiffs' conclusory allegations that Defendants' refusal to accept a third-lien position was a pretext for wrongful discrimination based on race.

---

[11] This court also notes that the Amended Complaint alleges that Plaintiffs' loan was to be "secured by" a second lien, (Am. Compl. (Doc. 5) ¶ 26), whereas the Kotis Holdings loan was "guaranteed" by a third lien. (Id. ¶ 37(f).) "Security" and "guarantee" have different meanings as a matter of law. <u>See, e.g.</u>, N.C. Gen. Stat. § 45-67(2) (defining "[s]ecurity instrument") and § 26-12 ("'[S]urety' includes guarantors, . . . or others who undertake liability on the obligation and for the accommodation of another."). It is therefore unclear that the Kotis Holdings loan security, described as a guarantee, is similar to Plaintiffs' loan.

### iii. __Section 1983 Due Process Claim (Count Two)__

Plaintiffs relatedly allege that, "while acting under color of law," Defendants deprived Plaintiffs of their due process rights by "violat[ing] their own policies and procedures after having first approved the loan to Plaintiffs and then arbitrarily reneging on the loan due to solely and in substantial part to the Plaintiffs' protected status as [] minorities and a minority-owned business." (Am. Compl. (Doc. 5) ¶¶ 40-41.)

In order to find a due process violation, a deprivation of a protected interest in life, property, or liberty must first be found. See Andrew v. Clark, 561 F.3d 261, 269 (4th Cir. 2009); Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145-46 (4th Cir. 2009). As Plaintiffs allege no facts suggesting that they were deprived of life or liberty, their claim must sound in property. In order to have alleged a valid due process claim based on a deprivation of property, Plaintiffs must allege that they (1) had a property interest; (2) of which the City deprived them; (3) without due process of law. See Tri-County Paving, Inc. v. Ashe Cty., 281 F.3d 430, 436 (4th Cir. 2002).

This court need only look to the first prong. In order for Plaintiffs to have had a valid property interest in the loan proceeds, they must have had "more than an abstract need or desire for it . . . more than a unilateral expectation of it. [They] must, instead, have a legitimate claim of entitlement to it." See Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577 (1972). As noted above, because a valid contract was never formed, and Plaintiffs admit that they never met the City's requirement of a second-place lien, they never had a legitimate claim of entitlement to the loan proceeds. The City Council's June 18 Resolution was only authorization for the City to enter into a contract on the terms set out in the Resolution. As this contract was never entered into, Plaintiffs never had any more than a unilateral expectancy. The court will therefore dismiss count two.

### iv. Conspiracy Claim (Count Five)

Plaintiffs also bring a civil conspiracy claim, alleging that Defendants have "unlawfully conspire[d] among themselves and agreed to . . . unlawfully deny Plaintiffs' funding which had been previously approved, based solely and substantially upon all Plaintiffs' racial status." (Am. Compl. (Doc. 5) ¶¶ 50-52.)

- 33 -

As Plaintiffs themselves acknowledge, a municipality may
not ordinarily be party to a conspiracy. (See Pls.' Opp'n Br. to
the City's Mot. to Dismiss (Doc. 22) at 14); Houpe v. City of
Statesville, 128 N.C. App. 334, 352, 497 S.E.2d 82, 93 (1998).
Plaintiffs allege no facts that suggest that the City's actions
fall into any sort of exception to this general rule, choosing
instead to argue that the actions of the City Council Defendants
constitute an exception to the doctrine of intra-corporate
immunity, which typically bars bringing a conspiracy suit
against officers in their official capacities. (See Pls.' Opp'n
Br. to the City's Mot. to Dismiss (Doc. 22) at 14.)

In support of this, Plaintiffs rely on Buschi v. Kirven,
775 F.2d 1240 (4th Cir. 1985), which lists two exceptions to the
intra-corporate immunity doctrine: (1) where the officer had a
personal stake in achieving the illegal objective independent of
the corporation; or (2) where an employee engaged in
unauthorized acts in furtherance of a conspiracy. Id. at
1252-53. Here, the Amended Complaint is devoid of any
allegations that suggest a personal motive by any City Council
Defendant, or of any allegations that a City Council Defendant
was acting in an unauthorized manner. As such, Plaintiffs have
failed to plead an exception to the intra-corporate immunity

- 34 -

doctrine, and thus failed to state a cognizable claim for conspiracy. Count five is thus dismissed.

### v.   Section 1986 Claim (Count Three)

Finally, Plaintiffs allege that Defendants "negligently failed and refused to act so as to restrain the deprivation of [Plaintiffs'] constitutional rights, including the right to be free from discrimination" in violation of 42 U.S.C. § 1986 based upon Defendants' "approval and subsequent reneging and refusal to follow through with the loan commitment made to Plaintiffs." (Am. Compl. (Doc. 5) ¶ 43.)

In order to maintain a cause of action under § 1986, a plaintiff must necessarily prove a civil conspiracy in violation of 42 U.S.C. § 1985, upon which § 1986 is derivative. See Clark v. Clabaugh, 20 F.3d 1290, 1295 n.5 (3d Cir. 1994) ("In order to maintain a cause of action under § 1986, the plaintiffs must show the existence of a § 1985 conspiracy."); see also Jenkins v. Trs. of Sandhills Cmty. Coll., Nos. 199CV00664, 100CV00166, 2002 WL 31941503, at *4 (M.D.N.C. Dec. 3, 2002); Wilson v. Wilson, No. 1:11CV182, 2011 WL 1328859, at *3 (M.D.N.C. Apr. 1, 2011). Plaintiffs have alleged no express violation of § 1985, although they have alleged a civil conspiracy claim. Regardless, for the reasons laid out above, Plaintiffs have

failed to sufficiently plead a conspiracy. As there is no sufficient claim for a violation of § 1985, this court must necessarily dismiss Plaintiffs' § 1986 claim.

IV. **CONCLUSION**

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (Docs. 10, 12) are **GRANTED** and Plaintiffs' Amended Complaint (Doc. 5) is **DISMISSED**.

A judgment consistent with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 11th day of December, 2015.

_____
United States District Judge

- 36 -