**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 16-1044**

———————————

MICHAEL WOODS; RAMONA WOODS; BNT AD AGENCY, LLC,

Plaintiffs – Appellants,

v.

CITY OF GREENSBORO, a municipality; NANCY VAUGHAN, in her official capacity; ZACK MATHENY, In his official capacity; MARIKAY ABUZUAITER, in her official capacity; T. DIANE BELLAMY-SMALL, in her official capacity; TONY WILKINS, in his official capacity; NANCY HOFFMAN, in her official capacity,

Defendants – Appellees.

———————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., Chief District Judge.  (1:14-cv-00767-WO-JEP)

———————————

Argued:  March 23, 2017                      Decided:  May 5, 2017

———————————

Before GREGORY, Chief Judge, WILKINSON, Circuit Judge, and DAVIS, Senior Circuit Judge.

———————————

Reversed and remanded by published opinion.  Senior Judge Davis wrote the majority opinion, in which Chief Judge Gregory joined.  Judge Wilkinson wrote a dissenting opinion.

———————————

**ARGUED:** Mark Lowell Hayes, LAW OFFICE OF MARK L. HAYES, Durham, North Carolina, for Appellants.  Patrick Michael Kane, SMITH MOORE LEATHERWOOD

LLP, Greensboro, North Carolina, for Appellees. **ON BRIEF:** Bruce P. Ashley, SMITH MOORE LEATHERWOOD LLP, Greensboro, North Carolina; John Roseboro, GREENSBORO CITY ATTORNEY'S OFFICE, Greensboro, North Carolina, for Appellees.

2

Racial stigmas and stereotypes are not impairing unless we internalize them. And there is no reason for us to do that when we know that the history of black culture in America is rich and reaffirming. We may live in a society that will only grudgingly and inconsistently acknowledge our equality, but that does not mean that we must live as if we are victims. I understand that avoiding the effects of racial stigmas and stereotyping is not always easy because many studies have shown that most people harbor implicit biases and even well-intentioned people unknowingly act on racist attitudes. However, this merely confirms that we alone cannot carry the burden of ameliorating racism in our country. This responsibility must be assumed by all good people without regard to race, sex, and ethnicity. [1]

DAVIS, Senior Circuit Judge:

This appeal requires us to consider whether it is plausible to believe that, in twenty-first century America, a municipal government may seek to contract with a minority-owned enterprise under some conditions, yet, on account of race, avoid contracting with a minority-owned company under other conditions.

In April 2013, Black Network Television Ad Agency, LLC ("BNT"), a minority-owned television network, was granted and then subsequently denied a $300,000 economic development loan from the City of Greensboro, North Carolina ("the City"), prompting BNT to file this action asserting a claim, among others, for racial

---

[1] Harry T. Edwards, *Reflections on Racial Stigmas and Stereotyping*, 8 (Unpublished Paper, University of Michigan Law School, March 25, 2017) (on file with the Clerk of Court as ECF opinion attachment) (footnote omitted) (citing Mahzarin R. Banaji & Anthony G. Greenwald, Blindspot: Hidden Biases of Good People (2013); R. Richard Banks, et al., *Discrimination and Implicit Bias in a Racially Unequal Society*, 94 Cal. L. Rev. 1169 (2006); Jennifer L. Eberhardt, et al., *Looking Deathworthy: Perceived Stereotypicality of Black Defendants Predicts Capital-Sentencing Outcomes*, 17 Psychol. Sci. 383 (2006); Anthony G. Geenwald & Linda Hamilton Kriegar, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945 (2006)). *See also* Get Out (Universal Pictures 2017).

3

discrimination pursuant to 42 U.S.C. § 1981.  The City argued, in support of its motion to dismiss the complaint for failure to state a claim upon which relief could be granted, that its willingness to grant BNT a loan *fully secured* by *a second-position lien* on the personal residence of BNT's principals, notwithstanding its unwillingness to grant BNT a loan *fully secured* by *a third-position lien* on that residence, foreclosed a claim of race discrimination as a matter of law.  BNT responded that, to the contrary, the City's refusal to make the loan was based upon stereotypes about the risk of lending to a minority business and that, at the pleading stage, its allegations suggesting the pretextual character of the City's explanation for the denial of the loan are sufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The district court agreed with the City's arguments, concluded that BNT's factual allegations were so insubstantial as to render its claim implausible, and therefore dismissed the complaint with prejudice.[2]

We hold that the district court's crabbed plausibility analysis, *see Woods v. City of Greensboro*, No. 1:14CV767, 2015 WL 8668228, at *8 (M.D.N.C. Dec. 11, 2015), misinterpreted and misapplied the controlling pleading standard.  The key issue in this case is not whether the City would contract with a minority-owned business, but whether the City would contract with BNT on the same conditions and under substantially the same circumstances as it would with a nonminority-owned business.  Because BNT has

---

[2] The district court also reasoned, in the alternative, that BNT lacked statutory standing to assert a race discrimination claim pursuant to 42 U.S.C. § 1981.  Just as we reject the district court's conclusion as to the legal sufficiency of BNT's race discrimination claim, we also reject the court's analysis of BNT's standing to assert such a claim.  *See infra* pp. 8–11.

4

plausibly pled that the conditions under which the City was willing to grant it a loan were more stringent than those the City applied to similarly situated white-owned applicants, we conclude that the district court erred in dismissing BNT's claim of discrimination at the pleading stage. Accordingly, for the reasons explained within, we reverse the district court's order dismissing this action and remand for further proceedings.

## I.

## A.

We begin by summarizing the cardinal facts surrounding BNT's application for, and the City's ultimate denial of, the economic development loan. (Additional factual allegations are discussed *infra* pp. 15–20.) Throughout, we consider as true all well-pleaded allegations in the complaint, matters of public record, and documents attached to the motion to dismiss that are integral to the complaint and of unquestioned authenticity. *Philips v. Pitt Cty. Mem'l Hosp.,* 572 F.3d 176, 180 (4th Cir. 2009).

In April 2013, members of the City's Economic and Business Development Office recommended that Michael and Ramona Woods (referred to by the parties, and hence herein, as "the Woods") submit an application for a $300,000 ten-year economic development loan for their company, BNT, as part of the City's economic development efforts. The Woods offered to secure the loan by way of a note and deed of trust to their home. On May 28, 2013, L.R. Appraisals, Inc., appraised the home at a value of

$975,000.00 "resulting in equity well over the $300,000.00 loan, after consideration of all existing loans on the residence." J.A. 14.[3]

Pursuant to Greensboro Code of Ordinances Section 4.55, the City may make economic development loans only after receiving authorization from its nine-member elected City Council. On June 18, 2013, at a regularly scheduled meeting, the City Council considered a Resolution authorizing the City to enter into a loan agreement with BNT. The Resolution, which was drafted by the Greensboro City Attorney's office, stated that the City's interest would be secured by "no more than a second lien" on the real property and improvements. J.A. 15. Assistant City Manager of Economic Development, Andy Scott, discussed with the City Council in open session the financial statements of the Woods and the collateral requirements of the proposed loan agreement and "stated [to the Council] that the City would be placed in the second loan position on the residence being used as collateral." J.A. 44. The City Council voted seven to two in favor of adopting Resolution 172-13, which authorized the City to enter into an agreement with BNT for the $300,000 loan. The Resolution provided the following conditions:

> WHEREAS, the borrower is required to confirm compliance with the following conditions prior to the City's loan closing to protect the public funds invested in the project;
> . . .
> 2) City will complete a title search confirming no additional liens are outstanding on the 5018 Carlson Dairy Road property that will secure the City's loan beyond the first mortgage that is currently outstanding.

---

[3] "J.A." refers to the Joint Appendix.

6

. . .
3) City will confirm that the first mortgage balance does not exceed $509,000.
. . .
8) City loan will be secured by a note and deed of trust with the City's interest secured by no more than a 2nd lien on the real property and improvements located at 5018 Carlson Dairy Road.
. . .
NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF GREENSBORO:
The City of Greensboro is hereby authorized to execute the necessary note and agreements with BNT Ad Agency LLC in accordance with the above terms and conditions.

J.A. 92–93.

As it turned out, in addition to a first mortgage, the Woods had a home equity line of credit on the property. The City informed the Woods that the Resolution would have to be amended to reflect that the City's security interest would be a third lien, rather than a second lien. On July 16, 2013, at a second meeting, the City Council considered modifying the Resolution. According to the minutes, the following occurred:

Assistant City Manager of Economic Development Andy Scott summarized the difference between the approved loan at the June 18 council meeting and the modifications made in the presented resolution; and spoke to the financial assessment of the Woods' collateral in terms of loan repayment.
. . .
Council discussed the capped equity limits by Carolina Bank; referenced three previous loans where the City had been in the third position; the desire to support minority owned small businesses; and concerns expressed about the City going from second to the third position in loan repayment.
City Attorney Shah-Khan advised that if Council chose to move forward with the transaction, it would be necessary to comply with the changes with what Council was now aware of; and stated the decision was a policy matter for Council.
Mayor Perkins stated there were speakers to the item.

7

> George Hartzman . . ., stated there was not enough equity in the property to fund the city's portion of a potentially defaulted loan; and encouraged Council to respect their fiduciary responsibility to the taxpayers.
>
> Mr. Scott stated there was sufficient collateral in the house based on the appraisal to support the loan.
>
> Ramona Woods . . . stated she had not intended to not disclose her loan positions; commented on Ashtae Products [sic] role in the Black Network Television; and provided a status report on marketing the television show.
>
> Mayor Perkins clarified that the former resolution stated that the City would not take worse than a second mortgage.

J.A. 129. The City Council then voted not to modify the Resolution to make a loan secured by a third-position lien, but left in effect the original Resolution and its terms. Subsequently, on February 18, 2014, the City Council officially revoked the Resolution authorizing the City to enter into a loan agreement with BNT.

## B.

The Woods and BNT filed suit in federal district court alleging violations of 42 U.S.C. §§ 1981, 1983, and 1986, the Equal Protection and Due Process clauses of the Fourteenth Amendment and the North Carolina Constitution, as well as state law claims for breach of contract, civil conspiracy, and unfair and deceptive trade practices. The district court dismissed all of the Woods' and BNT's claims. *See Woods*, 2015 WL 8668228, at *1. The court dismissed all claims asserted against the City and the Councilmembers in their individual capacities on the basis of legislative immunity. *Id.* at *4. The court dismissed the breach of contract, due process, conspiracy, and § 1986 claim for failure to state a cause of action. *Id.* at *6–7, *11–12.

8

The court considered together the plaintiffs' claims that the City discriminated against them on the basis of race by failing to modify the terms of the Resolution to provide BNT a loan. *Id.* at *8. The court first concluded that the Woods and BNT did not have standing to assert discrimination claims on the alleged facts. *Id.* at *7–8. The court also concluded that the plaintiffs failed to plausibly allege discrimination based upon race. *Id.* at *9. Specifically, the court reasoned that the plaintiffs failed to allege the existence of valid comparators, which in its view was essential to allegations of intentional disparate treatment. *Id.* at *10. The court also reasoned that it could not infer an intent to discriminate where "the initial Resolution was approved in part *because* Plaintiffs are minorities." *Woods*, 2015 WL 8668228, at *8.

BNT, alone, timely appealed the court's dismissal of its claim that the City discriminated against it in violation of § 1981.

## II.

## A.

We first address BNT's appeal of the district court's determination that it lacked standing to assert a claim under § 1981. We review this question of law de novo. *Frank Krasner Enters., Ltd. v. Montgomery Cty.*, 401 F.3d 230, 234 (4th Cir. 2005). There being no dispute in this case as to whether the requirements of a constitutional "case or controversy" are present, the sole issue here is whether both BNT itself and its particular claim fall within the zone of interest protected by § 1981. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1387 & n.3 (2014); *see also Bank of Am. Corp. v. City of Miami*, --- S.Ct. ---, 2017 WL 1540509 (U.S. May 1, 2017) (holding

9

that the city of Miami's claimed injuries at least arguably fell within the zone of interest protected under the Fair Housing Act).

The district court reasoned that under our decision in *Carnell Construction Corporation v. Danville Redevelopment & Housing Authority*, 745 F.3d 703 (4th Cir. 2014) "certification appears to be a requirement for standing in the Fourth Circuit" and, as a result, BNT lacked standing to bring a racial discrimination claim. *Woods*, 2015 WL 8668228, at *8. We conclude that the district court erred in this regard.

Section 1981 protects all persons from racial discrimination in making and enforcing contracts. 42 U.S.C. §1981.[4] In *Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*, the Ninth Circuit explained that although a corporation is not a person, it may acquire standing under § 1981 if it has acquired an "imputed racial identity." 368 F.3d 1053, 1055 (9th Cir. 2004). When a "corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981." *Id.* at 1060.[5] In *Thinket*, the plaintiff was a minority-owned technology services contractor certified by the United States Small Business Administration as a firm owned and operated by socially and economically

---

[4] Section 1981 provides, in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981.

[5] The Ninth Circuit's description of its zone of interest analysis as a component of "prudential standing" is no longer apt after *Lexmark,* but its reasoning as to the substance of the issue retains vitality.

10

disadvantaged individuals, eligible to receive federal contracts under the SBA's business development program. *Id.* at 1055. Each of the plaintiff's shareholders was African-American. *Id.* The *Thinket* Court found that under these circumstances, the corporation had acquired an imputed racial identity. *Id.* at 1059.

In *Carnell*, we adopted the *Thinket* approach, holding that if a corporation has acquired an imputed racial identity, it falls within the statutory zone of interest and may bring an action under § 1981. *Carnell*, 745 F.3d. at 715.[6] *Carnell* held that "a corporation that is minority-owned and has been properly certified as such under applicable law can be the direct object of discriminatory action and establish standing to bring an action based on such discrimination." *Id.* However, *Carnell*'s holding was more limited than the district court's analysis in this case suggests. *Carnell* did not state that standing was available *only* to a corporation that had been certified. Carnell "was certified by the Commonwealth of Virginia as a 'Small, Women- and Minority-Owned Business' *because* its president and sole shareholder is African-American." *Id.* (emphasis added). In addition, the *Carnell* Court noted that Carnell publicly represented itself as a minority business enterprise when it contracted to work with the Housing Authority. *Id.*

---

[6] *Carnell* was decided on March 6, 2014, 19 days before the Supreme Court's clarification of "statutory standing" in *Lexmark*. Thus, the *Carnell* panel did not have the benefit of *Lexmark* when it evaluated the corporate plaintiff's standing under § 1981. *Cf. United States v. Under Seal*, --- F.3d---, --- n.5, 2017 WL 1244855, *9 n.5 (4th Cir. 2017) (mentioning the impact of *Lexmark*).

Other cases make clear that certification is not a requirement to establish standing under § 1981.

> Circumstances in which a corporate entity may bring suit under Section 1981 include cases in which a corporation is owned entirely by shareholders of a single race, . . . cases in which a corporation has acquired a protected identity pursuant to a government designation, . . . or cases in which a corporation is 'established for the very purpose of advancing minority interests' . . . .

*New Louisiana Holdings, LLC v. Arrowsmith*, 2012 WL 6061710, at *7–8 (N.D. Ill. Dec. 4, 2012) (internal citations omitted) (surveying case law). Other courts have interpreted the holding from *Thinket* to depend on the identity of the shareholders or owners—and not any government designation or certification. *See Bains*, *LLC v. Arco Products, Ltd.*, 405 F.3d 764, 770 (9th Cir. 2005) (holding that a minority-owned corporation acquires an imputed racial identity from its shareholders); *Amber Pyramid, Inc. v. Buffington Harbor Riverboats, L.L.C.*, 129 Fed App'x 292, 295 (7th Cir. 2005) (same); *see also Contemporary Personnel, Inc. v. Godiva Chocolatier, Inc.*, No. 09–187, 2009 WL 2431461 at *2 (E.D. Pa. Aug. 6, 2009) ("While courts have adopted the imputed racial identity concept from *Trinket* [sic], those courts have only found corporations to have an imputed racial identity when *the owner, majority of shareholders and/or president are members of a specific class that is alleged to have been discriminated against*.").

In this case, the operative complaint alleges that BNT is entirely owned and led by a protected minority group and represented itself as a minority business enterprise when it sought to contract with the city. *See, e.g.*, J.A. 16 (BNT is "a minority-owned limited liability company"). While BNT does not allege that it was certified as such under the

12

law of North Carolina, it need not do so in order to establish standing.[7]  We hold that the district court erred because BNT has set forth sufficient factual allegations to establish an imputed racial identity, which confers standing to assert a racial discrimination claim under § 1981.

B.

We next review the district court's dismissal for failure to state a claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  We review dismissals under Federal Rule of Civil Procedure 12(b)(6) de novo.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

1.

As a preliminary matter, the parties dispute the correct pleading standard.  BNT argues that it has sufficiently pleaded a race discrimination claim and that it was not required to plead a prima facie case.  Appellant's Br. 10.  BNT relies on *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), which explained that the prima facie case is an "evidentiary standard, not a pleading requirement."  The City does not dispute that BNT need not establish a prima facie case, but argues that BNT relies on a superseded pleading standard articulated in *Conley v. Gibson*, 355 U.S. 41 (1957).  Appellee's Br. 10–11.

In *Swierkiewicz,* the plaintiff alleged discrimination based on his age and national origin in violation of the Age Discrimination in Employment Act of 1967 and Title VII of

---

[7] As § 1981 protects from race discrimination all persons, whites as well as blacks, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976), it is difficult to imagine why certification as a minority-owned enterprise would ever be thought to serve as a precondition to standing for such a claim.

13

the Civil Rights Act of 1964. 534 U.S. at 509. Swierkiewicz was a fifty-three-year-old Hungarian native employed by Sorema N.A. as a senior vice president and chief underwriting officer. *Id.* at 508. According to Swierkiewicz, the CEO demoted him and gave many of his duties to a thirty-two-year-old French national. *Id.* The district and appellate courts found that Swierkiewicz had not adequately alleged circumstances that support an inference of discrimination, but the Supreme Court held that "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . to survive [a] motion to dismiss," *id.* at 515, because "[t]he prima facie case . . . is an evidentiary standard, not a pleading requirement," *id.* at 510. The Court explained that applying *McDonnell Douglas* to Rule 12(b)(6) motions would establish a "heightened pleading standard" in contravention of Rule 8(a)(2). *Id.* at 512; *see also* Fed. R. Civ. P. 8(a)(2) (providing that a plaintiff need only state a "short and plain statement of the claim showing that the pleader is entitled to relief"). As further support, the *Swierkiewicz* Court cited the pleading standard as articulated in *Conley v. Gibson*, which required the plaintiff need only provide fair notice of what the claim is and the grounds upon which it rests. *Id.*; *see also Conley v. Gibson,* 355 U.S. 41, 47 (1957).

In *Bell Atlantic Corp. v. Twombly*, the Supreme Court announced a new pleading standard. 550 U.S. 544, 570 (2007) (abrogating the *Conley* standard). *Twombly* required that allegations must be more than conclusory. *Id.* at 557. In addition, under *Twombly*, allegations must be sufficient "to raise a right to relief above the speculative level," *id.* at 555, including sufficient facts to state a claim that is "plausible on its face," *id.* at 570. This requires that the plaintiff do more than "plead[] facts that are

14

'merely consistent with' a defendant's liability;" the facts alleged must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 556).

In *Iqbal*, the Court made clear that this heightened standard applied to all civil actions, including claims of discrimination. *Id.* at 684. The *Iqbal* Court considered allegations that the government discriminated against a Pakistani man detained by federal officials in New York City following the September 11 attacks. *Id.* at 666. Iqbal brought claims against Attorney General John Ashcroft and FBI Director Robert Mueller, arguing that they had "adopted an unconstitutional policy that subjected [Iqbal] to harsh conditions of confinement on account of his race, religion, or national origin." *Id.* A majority of the Supreme Court deemed Iqbal's claims of discrimination implausible in light of the fact that the September 11 attacks "were perpetrated by 19 Arab Muslim hijackers." *Id.* "As between that 'obvious alternative explanation' for the arrests, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion." *Id.* at 682 (quoting *Twombly*, 550 U.S. at 567) (citation omitted). Iqbal's allegations had "not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible,'" *id.* at 680 (alteration in original) (quoting *Twombly,* 550 U.S. at 570).

Following the Supreme Court's decisions in *Iqbal* and *Twombly*, we of course have had several occasions to explicate the new pleading standards. We did so, for example, in an employment discrimination case, *McCleary-Evans v. Maryland Department of Transportation*, 780 F.3d 582 (4th Cir. 2015), in which the plaintiff, an

15

African-American woman, alleged that a state agency discriminated against her when it refused to hire her. In support, she stated that she was a qualified applicant and that she was denied a position in favor of someone who was white. *Id.* at 583–584. She did not offer any comparison between herself and the individual who was hired. *Id.* at 584. A majority of the panel found that McCleary-Evans' allegations were fatally conclusory without additional facts to support a reasonable inference that the decisionmakers were motivated by race. To be sure, the Court explained, *Swierkiewicz* remained binding precedent and the plaintiff was not required to "plead facts establishing a prima facie case of discrimination to survive a motion to dismiss." *Id.* at 585. The Court further reasoned, however, that a plaintiff is nonetheless "required to allege facts to satisfy the elements of a cause of action created by [the relevant] statute" in compliance with *Iqbal*. *Id.* Applying this standard, the *McCleary-Evans* Court wrote: "[T]he defendant's decision to select someone other than her, and the cause that she asks us to infer (*i.e.*, invidious discrimination) is not plausible in light of the 'obvious alternative explanation' that the decisionmakers simply judged those hired to be more qualified and better suited for the positions." *Id.* at 588 (quoting *Iqbal*, 556 U.S. at 678).

The correct application of the above principles is straightforward. BNT need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss, but as the City argues, the more stringent pleading standard established in *Iqbal* and *Twombly* applies, not the superseded standard that BNT cited in its brief. *See Twombly*. 550 U.S. at 569–70 (reaffirming *Swierkiewicz*); *Francis v.*

16

*Giacomelli*, 588 F.3d 186, 192 n.1 (4th Cir. 2009) ("The [pleading] standard that the plaintiffs quoted from *Swierkiewicz,* however, was explicitly overruled in *Twombly*.").

2.

Finally, we consider whether BNT has offered sufficient factual allegations to support a plausible claim that the City acted, *pretextually*, on the basis of insufficient security (or, perhaps put differently, on the basis of an arguably irrational insistence on taking a "second lien" position without regard for the level of security supporting the requested loan) or, instead, *actually* on the basis of race. At this stage, BNT need only allege sufficient "factual matter (taken as true) to suggest" a cognizable cause of action. *Twombly*, 550 U.S. at 556.

BNT argues that the City Council refused to modify the terms of the Resolution "to allow Defendant Greensboro to take a third, but fully secured, position" for discriminatory reasons. J.A. 17. Unlike the allegations before the court in *McCleary-Evans*, BNT pleaded allegations beyond "a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. BNT's allegations include (1) the results of a disparity study demonstrating a pattern of the City almost exclusively lending to nonminority-owned businesses; (2) facts which suggest that the Woods' residence had sufficient equity to fully secure a third-position lien; and (3) examples of how the City has treated nonminority businesses differently, *including taking a third-position lien in approving a loan to a nonminority corporation*. Taken together, we hold that these allegations are more than sufficient to "nudge[] [BNT's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

17

*First*, BNT alleges that a June 2012 "Disparity Study for the Minority/Women Business Enterprise Program" demonstrates that of $92.4 million in economic development expenditures, less than $200,000—or .2%—was disbursed to minority businesses, despite the fact that the City is over 40% African-American. Appellant's Br. 3.[8] This Court may infer discriminatory intent from evidence of a general pattern of racial discrimination in the practices of a defendant. *Moore v. City of Charlotte, NC*, 754 F.2d 1100, 1105 (4th Cir. 1985); *Reynolds v. Abbeville County School District No. 60*, 554 F.2d 638, 642 (4th Cir. 1977). In this case, the June 2012 study of racial disparities in contracting by the City necessarily informs this Court's "common sense" analysis of whether BNT's allegations are plausible. *Iqbal*, 556 U.S. at 679.

*Second*, BNT alleges that, as a practical matter, there was no difference in risk between a third-position lien and second-position lien because there was sufficient equity in the property to fully secure the City's loan under either condition. This does not seem to be in dispute and, in fact, was stated in the open session during the July City Council meeting. But even if it could be disputed at some appropriate stage of these proceedings, this case had not arrived at that stage when the district court dismissed the case. We do not doubt that there may yet be sound, rational reasons why the City has insisted that it must take no worse than a second lien position in these circumstances, but again, that kind of factual exploration must await discovery and, if appropriate, summary judgment

---

[8] The City points out in a letter that the "disparity study concentrated on construction contracts, procurement contracts, and professional services contracts," not economic development incentives. J.A. 146.

18

proceedings. However sound the City's position may be, there is nothing *self-evident* on the face of the City's position that is material to BNT's claim of pretext.

Whether the City's nondiscriminatory explanation for rejecting the third-lien position is in fact pretext is a question to be analyzed under the long-familiar shifting burdens regime of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and not under Rule 12(b)(6). Still, under *Iqbal* and *Twombly*, the Court must consider the plausibility of inferring discrimination based on BNT's allegations in light of an "obvious alternative explanation" for the conduct. *Iqbal*, 556 U.S. at 682. In other words, while BNT need not establish a prima facie case at this stage, as discussed *supra* in Part II.B, we must be satisfied that the City's explanation for rejecting the loan does not render BNT's allegations implausible.

Viewed in the light most favorable to BNT, the operative complaint contains allegations of fact which undermine the City's explanation for rejecting the loan, in particular the allegation that there was sufficient equity to secure the loan whether the second or third lien condition applied. *The City has not yet disputed this allegation for it has yet to file its answer to the complaint*. There may well be, of course, other reasons that the City decided to deny the loan, such as a general unwillingness to change the terms of a resolution once it has been adopted, or perhaps a concern that BNT had failed to disclose important information, e.g., the existence of the second lien. The question is not whether there are more likely explanations for the City's action, however, but whether the City's impliedly proffered reason—that a third-positon lien presented too great a risk—is so obviously an irrefutably sound and unambiguously nondiscriminatory

19

and non-pretextual explanation that it renders BNT's claim of pretext implausible. *See Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (criticizing substitution of a probability standard for plausibility standard). We discern no such weakness in the inferences to be drawn based on the factual allegations here.

*Third*, and even if the above considerations were deemed insufficient to nudge the claim over the plausibility threshold, BNT actually alleges particular examples of how the City has treated similarly situated white businesses differently. BNT alleges that the City accepted third-position liens as collateral in other contemporary deals with nonminority firms. Specifically, in January 2013, the City Council voted to give an $850,000 loan to Kotis Holdings, a nonminority developer, which was secured by a third-place lien on a private residence.

BNT also alleges that the City was generally more willing to afford accommodating treatment to non-African-American/Hispanic companies. According to BNT's allegations (taken as true), the City provided nonminority company Gerbing a $125,000 grant without amending its policy to create a new incentive program. In another example, Mel's Pressure Washing, a nonminority company, received $450,000 in business over a six-year period without any contract on record or a bid approval for the work that was done. In addition, BNT alleges that the City entered into other deals with nonminority businesses that had a history of default, and therefore carried greater default risks. For example, the City allegedly provided a $2,000,000 forgivable loan to a nonminority borrower, Self Help, as well as a second installment of $100,000 to Greensboro Parking Group, LLC, a nonminority company that had defaulted in the past.

20

BNT also alleges that the City converted the nonminority-owned Nussbaum Center for Entrepreneurship's twenty-year $1,275,000 loan into a grant, despite the fact that it had defaulted on two initial loans. BNT asserts it had no such history or suggested risk of default, and that the City's refusal to modify its resolution, despite its continued willingness to work with defaulted nonminority entities, evidences disparate treatment based on race. These allegations support an inference of disparate treatment at this stage.

*There's yet more.* BNT alleges that the City has backed out of commitments to other minority companies, but does not treat white companies this way. In support of this assertion, BNT alleges that in 2014, the City Council attempted to renege on a $1.5 million dollar loan given to the International Civil Rights Museum, relying on a technicality that the documents on the loan were never signed, despite the fact that the City had already paid out $750,000 of the loan. The Civil Rights Museum's interim Chairwoman, Deena Hayes, stated that "there seems to be a higher standard" when it comes to the City lending to African-American companies. J.A. 19.

The district court reasoned that "many of the allegedly similarly situated businesses proffered by [BNT] are not valid comparators." *Woods*, 2015 WL 8668228, at *10. The court further reasoned that the "specific security position of the City is a financial decision that is not immediately subject to drawing inferences of racial discrimination within the context of minority small-business promotion." *Id.* This amounts to *fact finding*, not the conduct of a common sense plausibility analysis.

So viewed, we decline to credit this reasoning. While differences exist between the facts alleged in the case at bar and each of the comparative exemplars that BNT

21

offers, as would be expected, evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made at this point. *See Swierkiewicz*, 534 U.S. at 514 (challenges to the merits of a plaintiff's claim should be "dealt with through summary judgment under Rule 56"); *see generally* Charles A. Sullivan & Lauren M. Walter, Employment Discrimination Law & Practice §2.09[E] (2009). The similarly situated analysis typically occurs in the context of establishing a *prima facie* case of discrimination, not at the 12(b)(6) stage. *Haywood v. Locke*, 387 F. App'x 355, 358–59 (4th Cir. 2010). At this point, BNT has pleaded sufficient facts to justify an inference, plausibly and reasonably indulged, that the City treated it differently from the way it has treated nonminority businesses under arguably similar circumstances, and that it did so on account of race.

3.

Central to the district court's analysis was its conclusion that since "the initial Resolution was approved in part *because* [BNT's principals] are minorities, it is implausible that they were later *denied* a loan because of the same consideration." *Id.* at *8. We disagree. We break no new ground in observing that it is not implausible that the City was willing to contract with BNT on one set of terms, but, on account of race, it was unwilling to contract with BNT on another set of terms, although nonminority firms might meet with approval under both regimes.

A claim similar to BNT's was recognized in *Williams v. Staples, Inc.*, 372 F.3d 662, 667–68 (4th Cir. 2004). The plaintiff, Williams, brought a § 1981 claim of discrimination after he was prevented from purchasing a printer cartridge at a Staples

22

office supply and photocopying store.  *Id.* at 665.  When Williams presented a check, the clerk informed him that Staples did not accept out-of-state checks.  *Id.*  Later that day, a white customer was permitted to make a purchase using an out-of-state check.  *Id.* at 666.  The disparate treatment was replicated by a black and white tester.  *Id.*  We concluded that Williams had presented sufficient evidence to establish that Staples's refusal to take his check was a pretext for unlawful discrimination in violation of § 1981, *id.* at 670, even though Staples would sell to black customers if they did not use checks.  Invidious discrimination steeped in racial stereotyping is no less corrosive of the achievement of equality than invidious discrimination rooted in other mental states.

        We have previously admonished district courts, albeit in unpublished, non-precedential decisions, that imposing unique burdens or stereotypical expectations on an individual based on her membership in a protected group is illicit discrimination, even though the defendant may not discriminate consistently against *every* woman or minority under *all* conditions.  *See, e.g.*, *Wagner v. Dillard Dep't Stores, Inc.*, 17 F. App'x 141, 151 (4th Cir. 2001) (per curiam) (affirming a district court decision finding that an employer's stereotypical assumption that pregnant women will eventually require substantial absences from work violated Title VII).  It is past the time when that admonishment should be given precedential force.

        It is well established that an actor may consider another individual's race or gender to be an asset in some circumstances but a motivation for unlawful discrimination in other circumstances.  *See, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 257 (1989) (plurality opinion) (recognizing that stereotypical notions can play a role in a mixed-

motive employment discrimination case, even when the suspect comments were made by individuals who supported promoting the defendant) (superseded on other grounds). Indeed, it is unlikely today that an actor would explicitly discriminate under all conditions; it is much more likely that, where discrimination occurs, it does so in the context of more nuanced decisions that can be explained based upon reasons other than illicit bias, which, though perhaps implicit, is no less intentional. While a company may generally seek to hire women, it may also unfairly deny women positions once they become pregnant. While a school may affirmatively recruit minority students, the race of a student may simultaneously lead to harsher scrutiny when the individual has a disciplinary record. And while a lender may generally grant loans to African-American applicants, it may also view African-American borrowers as less creditworthy and more challenging risks than similarly situated white borrowers under some conditions. *See, e.g.*, Stephen Ross & John Yinger, The Color of Credit: Mortgage Discrimination, Research Methodology, and Fair-Lending Enforcement (2002).

In reaching our conclusion, we note that discrimination claims are particularly vulnerable to premature dismissal because civil rights plaintiffs often plead facts that are consistent with both legal and illegal behavior, and civil rights cases are more likely to suffer from information-asymmetry, pre-discovery. *See, e.g.*, Suzette M. Malveaux, *The Jury (or More Accurately the Judge) Is Still Out for Civil Rights and Employment Cases Post*-Iqbal, 57 N.Y.L. Sch. L. Rev. 719, 722–23 (2012-2013). There is thus a real risk that legitimate discrimination claims, particularly claims based on more subtle theories of stereotyping or implicit bias, will be dismissed should a judge substitute his or her view

24

of the likely reason for a particular action in place of the controlling plausibility standard. Such an approach especially treads through doctrinal quicksand when it is undertaken without the benefit of a developed record, one essential to the substantiation or refutation of common sense allegations of invidious discrimination. Affirmance of the dismissal of the complaint in this case, which catalogs numerous factual allegations beyond conclusory recitals of law, would establish a precedent that would inevitably lead to the premature dismissal of a host of other potentially meritorious discrimination claims where plaintiffs offer fulsome allegations similar to those invoked by BNT here.

*    *    *    *

"[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Manifestly, the rule of *Iqbal/Twombly* was not intended to serve as a federal court door-closing mechanism for arguably weak cases, even assuming this case fits the description of "arguably weak."[9] Whether BNT will have a difficult time establishing the

---

[9] Judge Niemeyer nicely summarized the controlling legal principles while reversing the district court's grant of a motion to dismiss in *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473 (4th Cir. 2015):

> While the court correctly accepted the complaint's factual allegations as true, it incorrectly undertook to determine whether a lawful alternative explanation appeared more likely. *To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely . . . . If her explanation is plausible, her complaint survives a motion to dismiss under Rule 12(b)(6), regardless of whether there is a more plausible alternative explanation.*

25

merits of its claim is of little import now.  The question before us is "'not whether [the defendant] will ultimately prevail' . . . but whether [the] complaint was sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (quoting *Swierkiewicz*, 534 U.S. at 514) (citations omitted).  We conclude simply that BNT has alleged sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 570.  No more was required of BNT to state a claim, and no more is required of us to so hold.

III.

For the reasons set forth above, the district court's order dismissing the § 1981 claim asserted by BNT is reversed and this case is remanded for further proceedings.

*REVERSED AND REMANDED*

---

      *The district court's inquiry into whether an alternative explanation was more probable undermined the well-established plausibility standard.*

*Id.* at 484 (citation omitted; emphasis added).

26

WILKINSON, Circuit Judge, dissenting:

If ever there were a case that failed to satisfy the plausibility standard on a Rule 12(b)(6) motion to dismiss, it is this one. BNT presents nothing more than bare speculation that racial discrimination influenced the City's treatment of its loan application. To the contrary, the minority-owned status of the business motivated the City to extend the loan in the first place. The complaint manifests that nothing but prudent, neutral, non-racial lending practices were at issue here. The dismissal was absolutely justified and I would affirm the district court.

I.

The majority ignores the whole point of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Those two decisions make clear that a well-pleaded complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 679 ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This "requires more than labels and conclusions," *id.*, because the court must be able to "draw the reasonable inference that the defendant is liable of the misconduct alleged," *Iqbal*, 556 U.S. at 678. And as relevant here, a claim may fail to reach this threshold if some "obvious alternative explanation" exists. *Twombly*, 550 U.S. at 567.

The distinction that *Twombly* and *Iqbal* draw between plausibility and mere possibility means this: in cases where there is no more than bald conjecture of

27

impermissible animus, the claim should be dismissed at the pleading stage. Discovery is an expensive and cumbersome process that parties should not frivolously be forced to undertake. *See id.* at 557–60. "So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotation marks omitted).

BNT has not met even the most permissive reading of these pleading requirements.

## II.

There can be no mistake that the City in fact approved BNT's request for a loan. Michael and Ramona Woods, the owners of BNT, "discussed with various City of Greensboro officials what a successful minority owned Greensboro-based television network would mean to the Greensboro community." J.A. 12–13. It is undisputed that City officials actually "suggested and recommended" that BNT apply for funding to facilitate production of its situational comedy, "Whatcha Cookin." J.A. 13. City officials then assisted BNT in framing the loan application, and the City Council later discussed "the desire to support minority owned small businesses." J.A. 129. In both word and deed, the City encouraged BNT's endeavor.

The City, however, conditioned its approval of the loan on a number of factors. These included a title search confirming that there were no liens beyond the first mortgage on the property that secured the loan, that the current mortgage debt outstanding on that collateral did not exceed $509,000, and that the City's interest in the

28

collateral would be prioritized at no worse than a second lien. J.A. 92. BNT failed to meet these conditions and petitioned the City to amend the specified terms, which the City refused to do. Although BNT alleges that it was unable to obtain a loan due to racial discrimination, an "obvious alternative explanation" for the City's action is immediately clear from the face of the complaint. *See Twombly*, 550 U.S. at 567. BNT simply did not satisfy prudent, neutral, non-racial loan conditions for eight months while the loan resolution was in place.

BNT alleges no direct evidence of racial bias, nor does it assert that any such evidence exists. Instead, BNT searches under bushes to propose additional facts from which animus might be inferred. BNT argues that there was sufficient equity in the collateral to secure the loan regardless of whether the City assumed a second or third lien. BNT also claims that the City has provided larger loans under equally or less favorable conditions to non-minority borrowers. BNT reasons, therefore, that the only remaining explanation for why it was unable to obtain a loan is presumptively discrimination. I disagree. This is the very type of baseless pleading that *Twombly* and *Iqbal* were meant to foreclose.

Home values, like any investment, can be volatile. Any lender knows the difference between a second and third lien: being second in line is better than being third. The City simply did not wish to wait behind two other outstretched hands in the event of a default. Recovery on any loan is never entirely certain. And BNT further overlooks that the Woods, who provided the collateral, failed even to convey to the City the true nature and amount of their debt obligation in the first place. Both parties encouraged the district

29

court to consider the City Council minutes concerning the loan. *Woods v. City of Greensboro*, No. 1:14CV767, 2015 WL 8668228, at *3 n.5 (M.D.N.C. Dec. 11, 2015). These minutes show that the City was unaware of the pre-existing second lien on the property that was offered as security. Ramona Woods responded to the City Council that "she had not intended to not disclose her loan positions." J.A. 129. But the City cannot be blamed for refusing to amend the terms of a loan upon finding that the collateral was more encumbered, both in the number and total debt obligation of outstanding liens, than the City had originally been led to believe.

The district court correctly observed that "the specific security position of the City is a financial decision that is not immediately subject to drawing inferences of racial discrimination." *Woods*, 2015 WL 8668228, at *10. Assuming that BNT could establish every fact alleged in the complaint, it would still be insufficient to plausibly support a finding of unlawful animus.

Although BNT references numerous other loans approved by the City, these loans provide no plausible route by which BNT can establish discriminatory intent. Whether a loan is a valid comparator is a legal conclusion for which the parties are not entitled to deference at the pleading stage. *See Iqbal*, 556 U.S. at 678 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" (quoting *Twombly*, 550 U.S. at 555)). The district court was quite correct to note that the provided examples primarily "involve either grant money, rather than loan money, City Council decisions that were made after a loan had already been disbursed, or a differently

30

constituted City Council." *Woods*, 2015 WL 8668228, at \*10. The supposed comparators are so far afield that almost any approval of a loan to a non-minority business could subject the City to a lawsuit.

BNT makes mention of an $850,000 loan made by the City to Kotis Holdings in January 2013. It argues that this loan, secured by a third lien and nearly three times the size of the loan BNT requested, is evidence that BNT was denied its loan due to racial bias.

But BNT forgets that the Kotis loan was part of a new incentive program offered to a local developer, not an economic development loan to a private business for goods and services. In other words, these loans differed in kind. BNT also failed to provide any indication as to the amount of available equity in the asset that secured the Kotis loan, which would be essential to establish a comparison. Moreover, the Kotis loan was initially approved with a third lien, whereas the City likely felt misled when BNT asked to renegotiate the basic terms of its loan after the loan was approved.

The majority surmises that BNT just might somehow conceivably manage to prevail. Yet the complaint itself makes clear that basic, elemental lending prudence was at work here. "As between that 'obvious alternative explanation' . . . and the purposeful, invidious discrimination [the plaintiff] asks us to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). BNT has therefore "not nudged [its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Even assuming all the facts alleged, BNT "stops short of the

31

line between possibility and plausibility," *id.* at 557, and fails to present "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678.

### III.

The majority is certainly right that racial prejudice in this society is persistent and that its modern incarnation may take more subtle forms. There is another side to this story, however, which *Twombly* and *Iqbal* serve to underscore. Promiscuous accusations of racial prejudice, as exemplified by this complaint, are diminishing the perceived gravity of those unfortunate situations where racial discrimination must be confronted and still does occur. Careless racial accusations carry a distinctive sting and visit an especial hurt that serves only to estrange and separate: Americans will eschew racial interactions that carry a risk of accusation when no unlawful animus is afoot. Allowing complaints such as this to go forward trivializes, sadly, the imperishable values our civil rights laws embody. A separatism born of unfounded accusations and pervasive racial attributions cannot be the society to which I or my fine colleagues in the majority aspire.

Courts should respect responsible decisionmaking rather than strip cities of sound lending practices just because a party injects race into the equation. It is no secret that municipal budgets are severely strained: the City should be respected both for seeking to extend a loan to BNT and for refusing to amend the associated conditions when, unexpectedly, its lien position turned more precarious.

The City Council minutes reveal that being a minority business was a plus here. J.A. 129; *see Woods*, 2015 WL 8668228, at *8 ("Given that it appears from the [minutes] that the initial Resolution was approved in part *because* Plaintiffs are minorities, it is

32

implausible that they were later *denied* a loan because of the same consideration."). The City openly wished to grant this loan to BNT and went to great lengths to help BNT prepare the loan application. The fact that the loan was actually approved shows that it was something the City wanted to do. BNT now faults the City for following sound and accepted lending practices. It would appear that no good deed goes unpunished: clichés, as the saying goes, sometimes become clichés because they are true.

33