IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BNT AD AGENCY, LLC,                    )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )        1:14CV767
                                       )
CITY OF GREENSBORO,                    )
                                       )
            Defendant.                 )


## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Plaintiff BNT Ad Agency, LLC, brings a claim for racial discrimination under 42 U.S.C. § 1981 against the City of Greensboro ("the City"). (Doc. 5.) Defendant has moved for summary judgment pursuant to Fed. R. Civ. P. 56(a). (Doc. 71.) Because this court finds that Plaintiff has failed to raise any genuine issue of material fact regarding whether the City discriminated against Plaintiff, as a minority-owned business, based on race, the City's motion for summary judgment will be granted.

## I.    FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

Plaintiff is owned by Michael and Ramona Woods ("the Woods"), who are both African-Americans. Plaintiff sought a $300,000 economic development loan from the City's Office of Economic Development and Business Support ("EDBS") in 2013 to

produce a sitcom, "Whatcha Cookin'." (Amended Complaint ("Am. Compl.") (Doc. 5) ¶¶ 16–18; Def.'s Brief in Support of Motion for Summary Judgment ("Def.'s Br.") (Doc. 72), Ex. B, Andrew S. Scott, III Affidavit ("Scott Aff.") (Doc. 72-2) ¶ 11.) EDBS staff assisted Plaintiff in applying for the loan. (Scott Aff. (Doc. 72-2) ¶ 11.) Plaintiff was originally going to pledge commercial property as collateral, on which the City would have taken a third position lien. (Michael Woods Affidavit ("Woods Aff." (Doc. 77) ¶ 13.) EDBS determined that the commercial property would be insufficient collateral, due to the amount of debt on the property, as well as the tax value of the property. (Scott Aff. (Doc. 72-2) ¶ 14.) The parties therefore agreed that the Woods' personal residence would secure the loan. (Id. ¶¶ 15–16.) The Woods provided a financial statement to EDBS, which listed assets and liabilities. (Scott Aff. Ex. A (Doc. 72-2) at 25.) The financial statement included a "Personal Residence" valued at $1,100,000 as an asset. (Id.) On the same financial statement, the Woods responded to the question "Mortgages on Real Estate" with "Personal Residence $509,000," indicating one lien on the property (Id.) The conditions pertaining to the collateral were as follows: (1) the City would have no worse than a second position lien on the Woods' personal residence; and (2) the amount of outstanding mortgage debt on the residence

was $509,000. (Scott Aff. (Doc. 72-2) ¶ 26). The house was
independently appraised at a value of $975,000. (Id. ¶ 16.) EDBS
staff and Plaintiff agreed to these terms and, as a result, the
proposed loan agreement was presented to the Greensboro City
Council. (Id. ¶ 17.) The City Council considered Plaintiff's
loan request on June 18, 2013, for a hearing and vote on a
proposed resolution (the "Resolution"), to authorize the
$300,000 loan. (Am. Compl. (Doc. 5) ¶ 22; Def.'s Br. Ex. F,
S. Mujeeb Shah-Khan Affidavit ("Shah-Khan Aff.") (Doc. 72-6)
¶ 7.) The loan conditions included proof of Plaintiff's
investment in the sitcom and a pledge of the Woods' residence as
collateral, on which the City would take a second position lien
as agreed. (Scott Aff. (Doc. 72-2) ¶¶ 21, 25.) The City Council
voted in favor of authorizing the loan on those conditions at
the June 18, 2013 meeting. (Am. Compl. (Doc. 5) ¶ 22.)

Several days later, Plaintiff asked to close the loan as
soon as possible in order to make payroll disbursements. (Scott
Aff. (Doc. 72-2) ¶ 26.) The City, however, became aware that
Plaintiff had provided inaccurate information about the proposed
collateral. (Id.) In particular, there was $71,000 more debt on
the collateral than the Woods had represented to the City
Council, and there were two liens, not one, on the residence.
(Am. Compl. (Doc. 5) ¶ 25; Scott Aff. (Doc. 72-2) ¶ 26.) The

Woods and Plaintiff could not provide a second lien position as agreed upon and approved; instead the City would receive a third lien position. (Am. Compl. (Doc. 5) ¶ 25; Scott Aff. (Doc. 72-2) ¶ 26.)

In light of these developments, Plaintiff requested that the City Council adopt a proposed Amended Resolution (the "Amended Resolution") to modify the loan in several ways: (1) the City would take a third, instead of a second, lien position on the personal residence; and (2) the debt amount on the collateral would be corrected to reflect the additional $71,000. (Am. Compl. (Doc. 5) ¶¶ 25-26; Scott Aff. (Doc. 72-2) ¶¶ 32-33.)

The City Council considered the Amended Resolution at a public meeting on July 16, 2013. (Am. Compl. (Doc. 5) ¶ 29; Scott Aff. (Doc. 72-2) ¶ 34.) Council members and city staff raised concerns about the new terms. (Scott Aff. (Doc. 72-2) ¶ 35.) The City Council ultimately voted 6-3 against adopting the Amended Resolution, (Def.'s Brief in Support of Motion to Dismiss Ex. C (Doc. 11-3) at 36)[1], but left the original Resolution in place until February 18, 2014, (Shah-Khan Aff. (Doc. 72-6) ¶ 27). Plaintiff could have chosen to proceed with

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

the loan under the original Resolution terms until that point. (Id.) The City's attorney made Plaintiff aware of the continued availability of the original loan in November 2013. (Id. ¶ 30.)

Plaintiff filed suit against the City and six Greensboro City Councilmembers in Guilford County Superior Court in August 2014, asserting several claims, including a claim for racial discrimination under 42 U.S.C. § 1981, arising from the City Council's decision not to adopt the Amended Resolution. (Complaint (Doc. 2) ¶¶ 30-61.) Defendant removed the case to federal court on the grounds that the complaint involved a federal question. (Petition for Removal (Doc. 1) at 3.) Defendants moved to dismiss Plaintiff's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6), (Defs.' Motions to Dismiss (Docs. 10, 12)), and this court granted those motions, (Memorandum Opinion & Order (Doc. 29)). Plaintiff appealed the dismissal of its Section 1981 race discrimination claim against the City to the Fourth Circuit Court of Appeals. (Notice of Appeal (Doc. 34).) The Fourth Circuit reversed the order dismissing the Section 1981 claim and remanded the case back to this court for further proceedings. Woods v. City of Greensboro,

855 F.3d 639, 642 (4th Cir. 2017).[2] Only the Section 1981 claim against the City remains. Id. at 653.

On remand, following discovery, the City moved for summary judgment, (Def.'s Motion for Summary Judgment (Doc. 71)), and submitted a memorandum in support of that motion, (Doc. 72)). Plaintiff responded to the motion, (Pl.'s Brief in Response to Motion for Summary Judgment ("Pl.'s Br.") (Doc. 76)), to which the City replied, (Defendant's Reply Brief (Doc. 84)). Plaintiff's attorney has also moved to withdraw from the case and strike the Reply to Defendant's Motion for Summary Judgment based on a lack of good faith support for the arguments in that motion. (Motion by Norman B. Smith, Attorney for Plaintiff, to Withdraw from Further Representation and to have Stricken Two Briefs (Doc. 80); Brief in Support of Motions by Norman B. Smith to Withdraw from Further Representation of Plaintiffs and to have Stricken Briefs (Doc. 81).) This court held a hearing on Attorney Smith's motions and denied both the motion to withdraw and the motion to strike. (Transcript of Motion Hearing 04/04/2019 (Doc. 85) 15:8-16.)

---

[2] After the Fourth Circuit remanded this case, BNT Ad Agency, LLC was the sole remaining plaintiff. (Order (Doc. 50) at 1.) The name of the case was therefore amended to reflect this change. (Id.)

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This court must look to substantive law to determine which facts are material — only those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).

This court therefore must determine whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252. The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718-19 (4th Cir. 2003). Ultimately, summary judgment should be granted "unless a

reasonable jury could return a verdict for the nonmoving party
on the evidence presented." Id. at 719.

**III. <u>LEGAL FRAMEWORK</u>**

Plaintiff claims Defendant violated Section 1981 by
refusing to adopt the Amended Resolution authorizing a loan to
Plaintiff. Section 1981 gives "[a]ll persons . . . the same
rights . . . to make and enforce contracts . . . as is enjoyed
by white citizens." 42 U.S.C. § 1981(a) (2012). A plaintiff may
prove a Section 1981 violation by either direct evidence of
discrimination or through circumstantial evidence. <u>Moore v. City
of Charlotte</u>, 754 F.2d 1100, 1105 (4th Cir. 1985).

To prove a case of discrimination by direct evidence, a
plaintiff must "produce direct evidence of a stated purpose to
discriminate . . . of sufficient probative force to reflect a
genuine issue of material fact." <u>Johnson v. Toys "R" Us-
Delaware, Inc.</u>, 95 F. App'x 1, 6 (4th Cir. 2004) (quoting
<u>Goldberg v. B. Green & Co.</u>, 836 F.2d 845, 848 (4th Cir. 1988))
(applying the standard for direct evidence from <u>Goldberg</u> to a
Section 1981 claim).

In the absence of any evidence of direct discrimination,
the Fourth Circuit has imported the <u>McDonnell Douglas</u> analytical
framework from the Title VII context into the analysis for
racial discrimination claims under Section 1981. See <u>Guessous v.</u>

<u>Fairview Prop. Invs., LLC</u>, 828 F.3d 208, 216 (4th Cir. 2016)

(explaining that the <u>McDonnell Douglas</u> framework was "developed

for Title VII discrimination cases," but "has since been held to

apply in discrimination cases arising under § 1981"). Under the

<u>McDonnell Douglas</u> framework, the plaintiff must first "proffer

sufficient circumstantial evidence" to "establish a prima facie

case of discrimination." <u>Williams v. Staples, Inc.</u>, 372 F.3d

662, 667 (4th Cir. 2004).

The Fourth Circuit has not considered a claim alleging

discrimination in the terms and conditions in lending under

Section 1981; <u>Williams v. Staples, Inc.</u>, a Fourth Circuit case

dealing with Section 1981 racial discrimination, applies to all

Section 1981 cases relating to "the purchase of goods or

services." <u>Williams</u>, 372 F.3d at 667. To establish a traditional

prima facie case of discrimination under <u>Williams</u>, a plaintiff

must

> establish that: (1) [they are] a member of a protected
> class; (2) [they] sought to enter into a contractual
> relationship with the defendant; (3) [they] met the
> defendant's ordinary requirements to pay for and to
> receive goods or services ordinarily provided by the
> defendant to other similarly situated customers; and
> (4) [they were] denied the opportunity to contract for
> goods or services that [were] otherwise afforded to
> white customers."

<u>Id.</u> After the plaintiff successfully makes out a prima facie

case of discrimination, "the defendant may respond by producing

evidence that it acted with a legitimate, nondiscriminatory reason," at which point the "plaintiff may adduce evidence showing that the defendant's proffered reason was mere pretext and that race was the real reason for the defendant's less favorable treatment of the plaintiff." Id. While the burden shifts back and forth between the plaintiff and defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

However, Williams did not specifically address discrimination in lending; it instead applies to "purchases of goods or services." Williams, 372 F.3d at 667. Plaintiff urges the court to depart from the Williams/McDonnell Douglas framework when considering alleged lending discrimination under Section 1981; in Plaintiff's view, "the inquiry in the context of lending should extend to an examination of how plaintiff was treated overall in comparison to how non-minorities were treated." (Pl.'s Br. (Doc. 76) at 6.) Plaintiff provides no authority for such a test, and this court could not find any. Such a test is not persuasive here, as there is no dispute that Plaintiff was considered for this loan and did in fact receive the loan as requested initially. Instead, Plaintiff's claims

must be considered within the context of a requested modification of a loan having been agreed to by Plaintiff in the first instance.

Various courts have taken different approaches to analyzing discriminatory lending cases. The Seventh Circuit declined to apply the McDonnell Douglas burden-shifting framework in "usual" credit discrimination cases. Latimore v. Citibank Fed. Sav. Bank, 151 F.3d 712, 714 (7th Cir. 1998). That court reasoned that lending does not present a "comparable competitive situation" to discriminatory hiring cases, such as McDonnell Douglas, in which a minority candidate and a white candidate vie for the same job. Id. Rarely, the court noted, will there be a situation in which a minority loan candidate and a white loan candidate be in competition for a loan; though "when we have an approximation to such a situation, a variant of the McDonnell Douglas standard may apply."[3] Id. Instead, "[i]t is always open to a plaintiff in a discrimination case to try to show in a conventional way, without relying on any special doctrines of

_____

[3] This court is not persuaded the Seventh Circuit's test should be applied, as this court does not find competition for a job or a loan to be a necessary part of the McDonnell Douglas analysis. Instead, it seems to this court that while there may be some competition for loan funds, the question remains whether minority borrowers are treated differently and less favorably, similar to the employment context, in a manner sufficient to establish discriminatory intent. That fact does not require competition.

-11-

burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue." Id. at 715.

The Third Circuit applied an adapted version of the McDonnell Douglas framework when plaintiffs plead Section 1981 racial discrimination in lending claims. Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 273-75 (3d Cir. 2010). Plaintiffs under the Third Circuit's test must show

> (1) that [they] belong[] to a protected class, (2) that [they] applied [for] and [were] qualified for credit that was available from the defendant, (3) that [their] application was denied or that its approval was made subject to unreasonable or overly burdensome conditions, and (4) that some additional evidence exists that establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent.

Id. at 275.

In adopting this new test, thereby modifying the third prong of the traditional prima facie test — the "similarly situated" requirement — the Third Circuit reasoned that "requiring evidence of similarly situated individuals in the lending context would be overly burdensome" because "the parties would likely have considerable difficulty determining which applicants are similarly situated." Id. at 274. The District Court for the Eastern District of Virginia, the District Court

-12-

for the Eastern District of North Carolina, and the District Court for the District of Maryland have applied the Anderson test in lending discrimination cases under Section 1981. Best Med. Int'l, Inc. v. Wells Fargo Bank, N.A., 937 F. Supp. 2d 685, 697 (E.D. Va. 2013); Pitt v. First Tenn. Bank Nat'l Ass'n, No. 4:17-CV-132-BO, 2018 WL 2391114, at *1 (E.D.N.C. May 24, 2018); Flippings v. U.S. Home Mortg., No. TDC-15-4021, 2017 WL 728179, at *3 (D. Md. Feb. 23, 2017).[4]

This court finds the Third Circuit's reasons for adopting a new test for Section 1981 lending cases, and the district court opinions in this circuit, persuasive. This court will therefore join the district courts for the Eastern District of North Carolina and the Eastern District of Virginia in adopting the Anderson test in the Section 1981 lending discrimination context.

---

[4] The Fourth Circuit, in an unpublished opinion, has applied the Eighth Circuit prima facie test for discrimination in Fair Housing Act ("FHA") and Equal Credit Opportunity Act ("ECOA") lending discrimination cases, in which the plaintiff must prove "1) they are members of a protected class; 2) they applied for and were qualified for an extension of credit; 3) [the lender] rejected their application for credit despite their qualifications; and 4) [the lender] continued to extend credit to others of similar credit stature . . . ." Wise v. Vilsack, 496 F. App'x 283, 285 (4th Cir. 2012) (citing Rowe v. Union Planters Bank of Southeast Mo., 289 F.3d 533, 535 (8th Cir. 2002)). Given that Wise dealt with FHA and ECOA claims, as opposed to Section 1981 claims, this court declines to adopt this prima facie test.

## IV.  **ANALYSIS**

Plaintiff fails to present any evidence to establish discrimination. For that reason, Defendant's motion for summary judgment will be granted.

### A.  **Direct Evidence**

Plaintiff fails to produce direct evidence of discrimination. A plaintiff must "produce direct evidence of a stated purpose to discriminate . . . of sufficient probative force to reflect a genuine issue of material fact." Johnson, 95 F. App'x at 6 (quoting Goldberg, 836 F.2d 845, 848 (4th Cir. 1988)).

Here, Plaintiff only offers the affidavit of Michael Woods. (Doc. 77.) Affidavits submitted on summary judgment must "be made on personal knowledge [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). "[H]earsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment." U.S. Dep't of Hous. & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Virginia, Inc., 64 F.3d 920, 926 (4th Cir. 1995). Further, this court "generally consider[s] self-serving opinions without objective corroboration not significantly probative" when considering a motion for summary judgment. Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996).

Plaintiff fails to "produce direct evidence of a stated purpose to discriminate," as Mr. Woods' affidavit does not contain any evidence that is not "self-serving" and "without objective corroboration." For example, Mr. Woods claims that the City never gave Plaintiff an opportunity to consolidate the first and second liens. (Woods Aff. (Doc. 77) ¶ 18.) This is false — the original loan was kept open for several months, which was communicated to Plaintiff.[5] (Shah-Khan Aff. (Doc. 72-6)

---

[5] Mr. Woods states in his affidavit that "[i]t is not correct that plaintiff was ever informed that the loan remained available for more than seven months until February, 2014 . . . ." (Woods Aff. (Doc. 77) ¶ 18.) This is not sufficient to create a material issue of fact, as Plaintiff does not dispute the loan was in fact kept open as described by the City. (Woods Aff. (Doc. 77) ¶ 18; Shah-Khan Aff. (Doc. 72-6) ¶ 27; Shah-Khan Aff. Ex. G (Doc. 72-6) at 71.) In addition, the City attorney did respond to Plaintiff in November 2013, stating, "If anything, the City and your clients could proceed under the original terms . . . . The original terms are still available." (Shah-Khan Aff. Ex. G (Doc. 72-6) at 71.) Even assuming Mr. Woods' statement is true — that the City was willing to accept a third position on the commercial property, (Woods Aff. (Doc. 77) ¶ 13), and the City later required a second position on the residence, there is nothing discriminatory about this fact. The Woods provided a financial statement to EDBS, which listed assets and liabilities, (Scott Aff. Ex. A (Doc. 72-2) at 25). The financial statement included a "Personal Residence" valued at $1,100,000 as an asset. (Id.) On the same financial statement, the Woods responded to the question "Mortgages on Real Estate" with "Personal Residence $509,000." (Id.) Thus, even if the Woods did not realize the City would require a second position lien, it was the Woods' own statement which led the City to believe it would be taking a second position lien on the Woods' residence.

(Footnote continued on next page)

¶ 27; Shah-Khan Aff. Ex. G (Doc. 72-6) at 71.) Further, Plaintiff contends that Mr. Woods' statements that the City being willing to accept a third position lien on Plaintiff's commercial property but not the residential property is direct evidence of discrimination. (Pl.'s Br. (Doc. 76) at 8; Woods Aff. (Doc. 77) ¶ 13.) There is no direct evidence of discrimination apparent in Mr. Woods' statements, and therefore his affidavit is not sufficient to support a finding of direct evidence of discrimination.

Because Plaintiff has not submitted direct evidence of intentional discrimination, Plaintiff must prove a Section 1981 violation through circumstantial evidence.

## B.  <u>The Anderson Framework</u>

Plaintiff's case fails under the Third Circuit's test as well.

There is no dispute Plaintiff meets the first two prongs of the Third Circuit test. The first prong of the <u>Anderson</u>

---

Mr. Woods does not challenge, explain, or contest the fact he provided the information contained in the Woods' financial statement; that his personal residence had a value of $1,100,00 with one mortgage in the amount of $509,000. Mr. Woods' assertion that "Plaintiff had assumed that the third lien likewise would carry over to the homeplace," (Woods Aff. (Doc. 77) ¶ 13), fails to establish direct evidence of discrimination because the Woods' financial statement, provided to the City, clearly shows that the City would occupy a second, not a third lien position on the residence.

framework requires Plaintiff to prove it is a member of a protected class. Anderson, 621 F.3d at 275. "A minority-owned corporation may establish an 'imputed racial identity' for purposes of demonstrating standing to bring a claim of race discrimination under federal law." Carnell Constr. Corp. v. Danville Redev. & Hous. Auth., 745 F.3d 703, 715 (4th Cir. 2014) (citation omitted). Because Plaintiff is minority-owned and has established an "imputed racial identity," Woods, 855 F.3d at 646, Plaintiff is a member of a protected class for the purpose of the Anderson analysis. Under the second requirement, Plaintiff must have applied, and have been qualified, for credit from Defendant. Anderson, 621 F.3d at 275. Here, Plaintiff applied for credit from the Defendant and was arguably qualified for credit of some kind, given the City kept its original offer open for some time. (Shah-Khan Aff. (Doc. 72-6) ¶ 27.) This is enough to satisfy the second requirement. Plaintiff, however, fails on the third and fourth prongs.

Regarding the third prong, the court must consider whether the City subjected Plaintiff's loan application to "unreasonable or overly burdensome conditions" when the City refused to take a third position lien on Plaintiff's proposed collateral. Anderson, 621 F.3d at 275. Plaintiff's only evidence to support this is Mr. Woods' affidavit.

Affidavits submitted on summary judgment must "be made on personal knowledge [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). "[H]earsay . . . is ordinarily an inadequate basis for summary judgment," <u>U.S. Dep't of Hous. & Urban Dev.</u>, 64 F.3d at 926, and this court "consider[s] self-serving opinions without objective corroboration not significantly probative" when considering a motion for summary judgment. <u>Evans</u>, 80 F.3d at 962.

Mr. Woods, in his affidavit, contends that he talked to people in the television industry who said "that the sitcom was likely to succeed and that the revenue projections were not unrealistic," (Woods Aff. (Doc. 77) ¶ 7), and that Plaintiff's credit was "excellent." (<u>Id.</u> ¶ 8.) These statements, however, are inadmissible hearsay, with regards to the former, and "self-serving opinions without objective corroboration" regarding the latter. Plaintiff provides no other evidence that the City's demand was unreasonable, and therefore fails to satisfy the third prong. Significantly, Plaintiff never explains why it was not able to execute the loan pursuant to the terms it had received from the City — a second lien position — nor does Plaintiff ever explain how its "excellent" credit was determined in light of a disclosed first lien which was not, in fact, correct and which the Woods were unable to deliver when the loan

was approved. Mr. Woods only states that the Woods "easily" could have consolidated the first and second loans, (id. ¶ 18), though fails to produce sufficient facts to support a jury finding that this could have been done.

Considering the fourth prong, Plaintiff does not provide any "additional evidence" that "establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class." Anderson, 621 F.3d at 275. To demonstrate that Plaintiff has been treated unfairly compared to nonminority businesses, Plaintiff offers for comparison several nonminority owned companies as comparators: Kotis Holdings, LLC ("Kotis"), (Pl.'s Resp. (Doc. 76) at 6); Beacon Management Corporation[6] ("Beacon"), (id. at 7); Oakley Capital ("Oakley"), (Pl.'s Br. Ex. A, Michael Woods Dep. ("Woods Dep.") (Doc. 72-1) at 25); Wind Hill Properties ("Wind Hill"), (id. at 26); Habitat for Humanity, (Def.'s Response to Pl.'s Interrogatories (Doc. 72-13) at ); and Affordable Housing Management, Inc., (id. at 10-11), all of which received loans from the City where the City took a third position lien on the collateral.

_____

[6] Beacon Management Corp. is the parent company of Churchview Place Limited Partnership and Rocky Knoll LLP, offered as comparators by Plaintiff, (Woods Aff. (Doc. 77) ¶ 20), both of which received loans from the City pursuant to the North Carolina Housing Finance Agency Qualified Allocation Plan. (Scott Aff. (Doc. 72-2) ¶¶ 43, 45-46.) This court will therefore refer to these loans as loans made to Beacon.

In an effort to show that Kotis was equally or less deserving of credit than Plaintiff in order to establish unfavorable treatment, Mr. Woods claims Kotis had "large amounts of unpaid taxes," (Woods Aff. (Doc. 77) ¶ 19), and provides documents from the Guilford County Tax Department supporting this assertion. (Woods Aff. Ex. B (Doc. 77-2).) Mr. Woods, however, provides no objective evidence of Plaintiff's tax documents or financial situation, nor does Mr. Woods explain how these facts made Kotis a more or less favorable borrower. Further, the tax listings Mr. Woods attaches only contain one listing as to Kotis Holdings, and that tax listing is for the year 2018. (Id. at 4.) That listing is wholly irrelevant to this case. The other companies are alleged to be associated with Mr. and Mrs. Kotis, but are not shown to have borrowed money from the City and thus are also irrelevant to this court's analysis.

Moreover, Mr. Woods states that the loans sought by Kotis "were supported by third deeds of trust, [and] essentially sought working capital." (Woods Aff. (Doc. 77) ¶ 19.) This statement fails to make the loans comparable. Indeed, the City's loan to Kotis was made as part of the Long Term Vacant Big Box Revitalization Loan Program, which was to increase the tax base by increasing the tax value of the real estate parcel. (Scott Aff. (Doc. 72-2) ¶ 40.) In contrast, the loan to Plaintiff was

not made pursuant to any established government economic development program. (Id. ¶¶ 4, 11.)

With respect to Beacon, Mr. Woods merely states that Beacon is managed by a Caucasian man and that the City has taken a third lien position on loans to Beacon. (Woods Aff. (Doc. 77) ¶ 20.) Plaintiff fails to mention that the City's loans to Beacon were part of the North Carolina Housing Finance Agency ("NCHFA") Qualified Allocation Plan to create affordable housing. (Scott Aff. (Doc. 72-2) ¶¶ 43, 46.) Plaintiff further produces no evidence demonstrating similarities between Plaintiff and Habitat for Humanity, Wind Hill, or Affordable Housing Management, Inc., though the court notes that the loans made to these three entities were affordable housing loans also made pursuant to the NCHFA Qualified Allocation Plan. (Id. ¶¶ 44, 47; Def.'s Response to Pl.'s Interrogatories (Doc. 72-13) at 10-11.) Plaintiff is therefore not similarly situated with these four companies.

Plaintiff fails to produce any evidence demonstrating similarities between Plaintiff and Oakley. Nevertheless, this court finds that Plaintiff and Oakley are not similarly situated, because the loan made to Oakley was a commercial real estate development loan made as part of the Downtown Urban Redevelopment Project. (Scott Aff. (Doc. 72-2) ¶ 41.)

The City has detailed several material differences between Plaintiff and Plaintiff's proffered comparators in the City's Brief in Support of Motion for Summary Judgment. (Def.'s Br. (Doc. 72) at 22–29.) The court finds several of these differences compelling, such as the fact that "[n]one of the alleged comparators was a television company like BNT who provided false information to the City and sought to secure its loan with its owners' personal residence" and that "[t]here is no evidence that [the comparators] asked for resolutions to be amended immediately after they were passed and the Council then adopted new resolutions changing initial loan terms." (Id. at 22.)

In support of Plaintiff's own credit-worthiness, Plaintiff only submits Mr. Woods' affidavit, in which he states that Plaintiff's credit was "excellent," and that Plaintiff "easily could have obtained the loan from commercial banks." (Woods Aff. (Doc. 77) ¶ 8.) Mr. Woods, however, admitted that the Woods approached at least one bank regarding a $300,000 loan around the same time and were told that "the banks could not do it." (Woods Dep. (Doc. 72-1) at 17.) Indeed, asserting that Plaintiff could have obtained the loan from commercial banks misses the point — Plaintiff did get a loan from the City, but Plaintiff wanted different terms. Plaintiff has not presented competent

evidence of anything commercial banks might have offered under
similar circumstances; in fact, quite the opposite.

While Mr. Woods provides the Guilford County Tax Department
documents, which arguably fall under the Fed. R. Evid. 803(8)
public records exception to the general hearsay prohibition, the
fact that Kotis was behind on taxes is not, on its face, enough
for this court to find that the City discriminated against
Plaintiff based on Plaintiff's race. Evidence of Kotis' tax
problems is little help to this court without Plaintiff's own
tax history and financial information for comparison. Indeed,
that the loans to the proposed comparators were made pursuant to
government programs makes it even more difficult to compare the
credit-worthiness of these companies and Plaintiff. Mr. Woods'
assertions as to the excellence of Plaintiff's credit do not
fill this gap, as these are "self-serving opinions without
objective corroboration" and therefore are "not significantly
probative." Plaintiff thus submits insufficient evidence for the
court to find that Plaintiff "establishe[d] a causal nexus
between the harm suffered and the plaintiff's membership in a
protected class."

Because Plaintiff fails to produce direct evidence of
racial discrimination and fails to satisfy the Anderson test,

Plaintiff fails to prove a case of Section 1981 racial discrimination.

### C. The Fourth Circuit Goods or Services Test and Seventh Circuit Lending Discrimination Test

This court would reach the same conclusion under the Fourth and Seventh Circuit tests as well.

Even if the court were to find that lending is a service for the purposes of applying Williams, Plaintiff would fail on the "similarly situated" prong. Plaintiff does satisfy the first two requirements under the Williams test, as Plaintiff is a member of a suspect class, satisfying the first requirement, and Plaintiff unequivocally sought to contract with the City for a loan, satisfying the second requirement. (Am. Compl. (Doc. 5) ¶¶ 16-18; Scott Aff. (Doc. 72-2) ¶ 11.)

Plaintiff fails, however, to satisfy the "similarly situated" requirement, the third prong of the prima facie case. The Fourth Circuit has not specifically addressed the standard for "similarly situated" in the services context.

Nevertheless, this court finds the test from the Title VII context helpful, that "plaintiffs are required to show that they are similar in all relevant respects to their comparator." Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010). While exact symmetry between Plaintiff's situation or actions and those of others is not required, they must be materially

similar. See Moore, 754 F.2d at 1107 (misconduct must be of "comparable seriousness" in disparate discipline comparison). It is this court's task to discern the relative similarity of conduct or misconduct relied on by the parties at summary judgment. Id. The Eleventh Circuit has held that "a plaintiff asserting an intentional-discrimination claim under McDonnell Douglas must demonstrate that she and her proffered comparators were 'similarly situated in all material respects.'" Lewis v. City of Union City, 918 F.3d 1213, 1218 (11th Cir. 2019).

In the lending context, the Eleventh Circuit, in Boykin v. Bank of America Corp., 162 F. App'x 837, 839 (11th Cir. 2005), provides further guidance on which factors are relevant in determining whether plaintiffs and their proposed comparators are "identical or directly comparable in all material respects" in the context of Fair Housing Act ("FHA") lending discrimination cases. While the present case was brought under Section 1981, the 11th Circuit analyzes FHA cases under the McDonnell Douglas framework, id., and thus is useful to this court in determining whether Plaintiff is "similarly situated" with Plaintiff's proposed comparators under the Section 1981 McDonnell Douglas framework. The Eleventh Circuit held that "a comparator's credit qualifications and loan details must be nearly identical to the Plaintiff's in order to prevent this

-25-

court from second guessing the [lender's] decision and confusing apples with oranges." Boykin, 162 F. App'x at 839 (quotation marks omitted) (quoting Cooley v. Sterling Bank, 280 F. Supp. 2d 1331, 1340 (M.D. Ala. 2003)).

Plaintiff offers several companies for comparison, most prominently Kotis and Beacon, that received loans from the City where the City took a third position lien on the collateral. However, even Plaintiff concedes that, if the court applied the traditional Williams prima facie framework to loans, "the proffered comparators [would] not match in all relevant respects." (Pl.'s Br. (Doc. 76) at 7.)

The court agrees that Plaintiff would not be similarly situated with these companies in all material respects. Plaintiff fails to provide sufficient evidence that Plaintiff has comparable "credit qualifications" to the proposed comparators, or that Plaintiff is directly comparable in all material respects with regards to the "loan details" themselves.

First, considering the "credit qualifications" of Plaintiff and the suggested comparators, Plaintiff fails to submit any evidence of the relevant financial status of the proposed comparators. Again, Plaintiff provides only Mr. Woods' affidavit as evidence, which is insufficient to demonstrate that Plaintiff is similarly situated with the proposed comparators. Mr. Woods'

contention that Kotis owed back-taxes from several of the Kotis Holding entities, (Woods Aff. (Doc. 77) ¶ 19), supported by the documents from the Guilford County Tax Department, (Woods Aff. Ex. B (Doc. 77-2)), does not create a material issue of fact because Mr. Woods provides no objective comparative evidence of Plaintiff's tax documents or financial situation. Indeed, Plaintiff produces no evidence of the equity available in the Kotis properties, as compared to the Woods. With respect to the other companies, Plaintiff again provides no evidence whatsoever that these companies and Plaintiff were comparable candidates for credit. In support of Plaintiff's own credit-worthiness, Plaintiff only relies upon Mr. Woods' affidavit, in which he self-servingly states that Plaintiff's credit was "excellent," and that Plaintiff "easily could have obtained the loan from commercial banks." (Woods Aff. (Doc. 77) ¶ 8.) Mr. Woods' conclusory statement that his credit was "excellent" may be genuine as to his opinion of his credit, but it is irrelevant here because the critical issue is the opinion of the lender. Mr. Woods offers no objective evidence of equity in his property of a third lien, why "excellent credit" suggests the City or any lender would issue a loan in exchange for a third position to any borrower, nor does it offer any basis to allow a fact-finder

to make any kind of comparison, and, resultingly, infer discriminatory intent.

As the court has already stated, without corroborating objective evidence, neither hearsay, U.S. Dep't of Hous. & Urban Dev., 64 F.3d at 926, nor self-serving statements in an affidavit, Evans, 80 F.3d at 962, will defeat a motion for summary judgment. Given that Plaintiff fails to provide sufficient "corroborating objective evidence" to support the assertions and conclusions in Mr. Woods' affidavit, Plaintiff would not satisfy the third prong.

Second, a comparison of Plaintiff's "loan details" with those of the proposed comparators reveals few similarities. The loans to potential comparators were affordable housing development loans (Beacon, Wind Hill, Habitat for Humanity, and Affordable Housing Management, Inc.) and commercial real estate development loans (Kotis and Oakley), both of which are types of loans typically made by the City. (Scott Aff. (Doc. 72-2) ¶¶ 40-41, 43-47.) In contrast, the City advised Plaintiff at least twice that their loan was unique. (Scott Aff. (Doc. 72-2) ¶¶ 20, 35.)

Further, in the case of Kotis, the commercial real estate development loan at issue was accounted for in the City's budget. (Id. ¶¶ 40.1, 40.3.) In comparison, Plaintiff sought a

unique loan for which money was not allocated in the City's
budget. (Scott Aff. (Doc. 72-2) ¶ 20.) With regards to Oakley,
the commercial real estate development loan was made under an
established government program, as opposed to Plaintiff's, which
was not. (Scott Aff. (Doc. 72-2) ¶ 41.)

The affordable housing loans on which the City took a third
position lien are also distinct from Plaintiff's situation. The
subordination of the City's lien to third position in these
loans was made pursuant to NCHFA Qualified Allocation Plan, an
established agency plan, which required the City to take a third
position lien. (Scott Aff. (Doc. 72-2) ¶¶ 43-47.) With
Plaintiff's loan, by contrast, the City's third position was not
due to any other government program. Plaintiff's loan details
are therefore not similar to those of the affordable housing
development loans.

Because Plaintiff fails to produce direct evidence of
racial discrimination and fails to produce similarly situated
comparators under the Williams/McDonnell Douglas burden shifting
framework sufficient to support an inference or finding of
discrimination, Plaintiff fails to demonstrate a material issue
of fact for a Section 1981 racial discrimination claim under
Williams, in response to the City's motion for summary judgment.

For the same reasons stated above, under the Seventh Circuit test, Plaintiff fails to "show in a conventional way, without relying on any special doctrines of burden-shifting, that there is enough evidence, direct or circumstantial, of discrimination to create a triable issue." Latimore, 151 F.3d at 715.

"Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court." Evans, 80 F.3d at 962. Affidavits submitted on summary judgment must "be made on personal knowledge [and] set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Conclusory statements alone will not defeat a motion for summary judgment. Evans, 80 F.3d at 962. Mr. Woods' affidavit fails to provide any material evidence that is not hearsay or conclusory statements.

Because Plaintiff fails to raise a genuine dispute as to any material fact, summary judgment is therefore appropriate.

## V.    **CONCLUSION**

For the foregoing reasons, this court finds that Defendant's motion for summary judgment should be granted.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment, (Doc. 71), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Expert Testimony of Howard Rockness, (Doc. 69), is **DENIED AS MOOT.**

A judgment in accordance with this Memorandum Opinion and Order will be entered contemporaneously herewith.

This the 18th day of September, 2019.

_____
United States District Judge