**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————————

**No. 19–2123**

————————————

BNT AD AGENCY, LLC,

> Plaintiff – Appellant,

and

MICHAEL WOODS; RAMONA WOODS,

> Plaintiffs,

ROBERT PERKINS,

> Intervenor/Plaintiff.

v.

CITY OF GREENSBORO, a municipality,

> Defendant – Appellee,

and

TONY WILKINS; NANCY HOFFMAN; NANCY VAUGHAN; ZACK MATHENY; MARIKAY ABUZUAITER; T. DIANE BELLAMY-SMALL,

> Defendants.

————————————

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:14–cv–00767–WO–LPA)

————————————

Submitted:  September 11, 2020                    Decided:  December 10, 2020

———————————

Before GREGORY, Chief Judge, WILKINSON, and NIEMEYER, Circuit Judges.

———————————

Affirmed by unpublished opinion. Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined. Judge Wilkinson wrote a concurring opinion.

———————————

Mark L. Hayes, LAW OFFICE OF MARK L. HAYES, Durham, North Carolina, for Appellant. Patrick M. Kane, Kip D. Nelson, FOX ROTHSCHILD LLP, Greensboro, North Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Chief Judge:

To promote minority business enterprise and economic development in the community, the City of Greensboro entered into a loan agreement with BNT Ad Agency, LLC ("BNT"), a minority-owned television network, to support BNT's production of a television sitcom. The loan never came to fruition, and BNT and its owners sued the City, claiming that the City and several of its City Council members engaged in racial discrimination in lending by imposing unreasonable and overly burdensome loan conditions. The district court granted summary judgment to the City on BNT's claim, concluding BNT failed to present any evidence to establish a prima facie case of discrimination. For the following reasons, we affirm.

## I.

Michael and Ramona Woods are the owners of Appellant BNT, a small business engaged in providing "family-oriented television programming." In 2012, operating under the name Black Network Television, BNT began production in the City of Greensboro of thirteen episodes of a new sitcom called "Whatcha Cookin'." According to BNT, the sitcom was "scheduled for possible syndication" for the upcoming 2014 television season. J.A. 17.

After producing eight episodes, BNT, with the assistance of a member of Greensboro's City Council, engaged in discussions with the City's Office of Economic Development and Business Support ("EDBS") regarding a working capital loan of $300,000 to fund production of the sitcom's remaining five episodes. BNT's loan request

to finance production of a sitcom was unlike any other loan request the City had received. The City had no experience with the entertainment industry, and funding this type of project was "far outside the City's routine lending practices," J.A. 226, as the City did not currently have a small business loan program and did not ordinarily make working capital loans of any kind. But because EDBS staff understood that the request to assist BNT came directly from a member of the City Council, EDBS worked with BNT on a possible loan from the City.

The process moved forward even though no established loan program fit BNT's request and there was no designated fund in the City's budget for such a loan. But EDBS staff became concerned regarding the viability of a loan to BNT given BNT's financial information, which was based on the company's informal recordkeeping and unaudited financial statements, and the speculative nature of its sitcom revenue projections and expense assumptions. Further, television industry experts with whom EDBS consulted advised that the sitcom was unlikely to be successful and BNT's stated revenue projections were unrealistic.

BNT originally offered commercial property owned by Mr. and Mrs. Woods as collateral for the loan, on which the City would have taken a third position lien. But EDBS determined the commercial property offered insufficient collateral based on its tax value and the amount of debt encumbering the property. The parties therefore agreed that the Woodses' personal residence would secure the loan. They provided EDBS a financial statement listing a "personal residence" valued at $1,100,000 and encumbered by a "Mortgage on Real Estate" of $509,000, indicating a single lien on the property. J.A. 248,

4

588. But later the residence was independently appraised for only $975,000, and although the appraisal indicated there was enough equity to secure the loan, EDBS staff suggested that BNT pursue alternative financing sources, including using the equity in their personal residence to obtain a bank loan. BNT elected to move forward with the City loan.

BNT's loan request came before the City Council for a public hearing and vote on June 18, 2013 (the "June Council Meeting"). A proposed Council resolution (the "Resolution") authorized the City to enter into a $300,000 loan agreement with BNT if certain conditions were met. Among these conditions, BNT was required to provide proof of BNT's own investment in the sitcom. The Resolution reflected, based on the financial information BNT provided, that BNT had already invested $713,105 of the $1,013,105 total production cost.

The Resolution memorialized that the Woodses had pledged their personal residence as collateral for the loan, on which the City would have no worse than a second position lien, and that, according to their financial statement, had an outstanding debt of $509,000, which was subject to confirmation by the City via a title search. The Woodses were also required to provide their personal guarantees and "acceptable personal credit reports" as well as the corporate guarantee of a second company they owned, Ashtae Products, Inc. J.A. 253, 259. Annual financial statements and/or tax returns were required for both BNT and Ashtae Products, and the Woodses had to submit an updated personal financial statement to include personal federal tax returns within six months of year-end each year. J.A. 259. Consistent with the loan's stated economic development purpose and the City's practice to require job creation as part of its economic development projects,

5

BNT was required to create three full time and five part time jobs in the community within the next year. And although the Woodses' commercial property was no longer collateral for the loan, the Resolution required a Phase I environmental site assessment of the property and that the Woodses assign all leases for the commercial property to the City.

EDBS did not make a specific recommendation regarding adoption of the Resolution. But staff did alert the Council in advance of the meeting that the proposed loan posed a risk because "100% of the revenues associated with syndicating the sitcom and projected to be the source of the repayment of the loan are speculative and dependent on the new show achieving ratings necessary for the networks to pick up the show." J.A. 251. Staff "ha[d] concerns about the ability to realize the projected revenue resulting from the syndication of the show and dated financial information reviewed on the personal and corporate guarantors." J.A. 252. Also, EDBS staff noted that BNT's financial statements were not prepared by an accountant and were unaudited.

At the hearing, the Council discussed the loan terms and the economic benefits the project could bring the Greensboro community, including development of a film industry in the area, employment opportunities, potential revitalization of the neighborhood, and a financial infusion for local businesses. A majority of Council members expressed support for the venture but also discussed that this was not the type of loan the City typically made and that the Council could be setting a precedent for making loans outside of an existing City loan or economic development program. Although the City had identified $300,000 that had been designated for another purpose to be used for the loan, it had no official source of funding. Another Council member noted the jobs to be created would pay below

6

the City's median income. They also discussed that EDBS staff viewed the loan as risky because the City had no experience in supporting a sitcom, projected revenue from the sitcom was speculative, the City was taking a second lien on the Woodses' personal residence as collateral, and BNT's financial information was dated and unaudited. Despite these concerns, the Council, by a 7 to 2 vote, adopted the Resolution and authorized the City to make the loan.

But a few days later, signs of trouble appeared. BNT asked that the loan be closed by June 28, 2013 so that the company could make payroll. The City then became aware through the required title search that the information BNT provided about the proposed collateral was not accurate. The $509,000 figure on the Woodses' personal financial statement did not reflect a single residential mortgage, but rather was the sum of a traditional mortgage of $280,000 and a home equity line of credit of approximately $300,000, for a total indebtedness of $580,000. Thus, there were two prior liens, not one, on the residence, and it was encumbered by $71,000 more debt than represented on BNT's financial statement.[1]

Based on this new information, EDBS staff concluded BNT could not satisfy the loan conditions required by the Resolution because it could not provide a second lien position as approved by the Council. Nor could BNT offer the anticipated amount of equity in the collateral due to the additional outstanding debt on the property. BNT also had

---

[1] BNT's counsel asserted the figure was correct at the time of the loan application but grew by $71,000 as the Woods continued to draw on the "continually fluctuating" home equity line of credit to finance the project. J.A. 495.

difficulty providing documentation of its investment in the sitcom's production.  The company sometimes provided only non-specific paper receipts, checking account statements, and credit card receipts as "proof" of alleged expenditures.  The City Attorney informed the City Council of these developments as well as BNT's payroll difficulties.

In light of these revelations, EDBS staff again encouraged BNT to obtain a bank loan.  Instead, BNT requested that the Council adopt an amended resolution modifying certain terms of the loan, including that (1) the City take a third position lien on the proposed collateral; (2) the debt owed on the collateral was $580,000 instead of $509,000; (3) BNT be allowed an extra twenty-six months to create the full and part time jobs required as a condition of the loan; (4) BNT only be required to document $514,809 rather than $713,105 of its own investment in the sitcom;[2] and (5) the City would no longer require (a) an environmental assessment of the Woodses' commercial property; or (b) an assignment of the leases for the commercial property.[3]

The proposed amended resolution was presented to the City Council for public discussion and a possible vote at its July 16, 2013, meeting. ("July Council Meeting"). Some Council members continued to speak favorably about the loan and the benefits the success of BNT's efforts could bring to the City, including one member who spoke in favor

---

[2] BNT later provided documentation that it met the Resolution's original investment requirement.

[3] In his affidavit, Mr. Woods refers to these modifications as "technical changes" that became necessary when the personal residence was substituted for the commercial building as collateral for the loan.  He "assumed that the third lien" originally contemplated for the commercial property would "carry over" to the personal residence.  J.A. 496.

8

of the modification of the loan conditions to support BNT as a minority-owned small business.  He cited the City's recently completed disparity study[4] that concluded that the City was at "less than 1% investment when it comes to the minority community." Videotape of Meeting of Greensboro City Council, July 16, 2013, at 6:49:15.

But other Council members and City staff again raised concerns about the risks associated with the loan.  The Assistant City Manager revealed that there were in fact two prior liens on the Woodses' personal residence and that the debt owed on the property was significantly greater than had been represented, but acknowledged there was sufficient equity in the property to support the third lien.  City staff confirmed that the second position home equity line of credit was capped at $300,000 and could not increase further.

The Council was again cautioned that the loan remained risky and was not typical of the types of loans the City issued.  In discussing the City's possible acceptance of a third position lien, the City Attorney stated that if BNT defaulted on the loan the City would have to pay off the first and second liens to superior lienholders, which would require an extra mailing because the City would have to send two smaller lien payoffs rather than one larger lien payoff.  Accepting a third position lien could pose a risk in the event that the collateral sold for less than its appraised value.  Other Council members expressed

---

[4] The disparity study is not part of the Joint Appendix.  According to BNT, the "Disparity Study for the Minority/Women Business Enterprise Program," Finding E-2, reveals that in the City of Greensboro, where the population is over 40% African American, minority-based enterprises ("MBEs") were awarded .21% of prime construction contracts, .80% of professional service contracts, and 3.75% of procurement contracts.  *See also* "Demographic and Income Comparison Profile," City of Greensboro Planning Department.

9

dissatisfaction with the proposed delay in the required job creation and that the City had not received accurate information from BNT.

BNT made a presentation to the Council in support of the proposed amended resolution. In explaining the discrepancy between information provided to the City prior to the June Council Meeting and the information discovered via the title search, Mrs. Woods stated that her focus had been on the total amount owed on their personal residence rather than the lien position the City would take. In an effort to reassure the Council that the loan would be repaid, she stated that Ashtae Products, which had provided its corporate guarantee for the loan, had been paying BNT's bills.[5]  J.A. 415.

The Council, in a 6 to 3 vote, declined to adopt the proposed amended resolution. Accordingly, the Resolution remained in effect and the City continued to offer the loan under its original terms. J.A. 125. But BNT did not move forward to close the loan. Instead, in October 2013, BNT, through counsel, alleged racial discrimination by the City. The City Attorney responded, informing BNT of the continued availability of the original loan, as well as the Council's reasons for declining to adopt the proposed amended resolution, including, among other reasons, that the City would be in third position in the event of default, and that the Council had become aware that BNT had provided inaccurate financial information prior to the Council's June meeting. The loan under the original terms remained available to BNT until the City Council rescinded the Resolution in

---

[5] In his affidavit, Mr. Woods referred to this as "an intercorporate loan from a related entity" made in anticipation of receiving financial assistance in the form of the $300,000 loan. J.A. 497.

10

February 2014 to allow the $300,000 set aside for the loan to be used for other City expenses.

BNT and the Woodses sued the City and six of its nine City Council members in state court, alleging, among other claims, that the City Council's refusal to adopt the amended resolution and offer a loan to BNT under its proposed terms amounted to racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The City and Council members removed the case to federal court, where the district court dismissed BNT's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. BNT appealed to this Court solely on the dismissal of its § 1981 racial discrimination claim against the City. We reversed and remanded the case for further proceedings. *See Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017).

On remand and following discovery, the City moved for summary judgment on the § 1981 claim. The district court granted the City's motion, finding BNT failed to present any direct or circumstantial evidence of discrimination. The district court held that BNT's only evidence, an affidavit by Michael Woods, was "self-serving" [and] "without objective corroboration." J.A. 600–01. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("self-serving opinions without objective corroboration [are] not significantly probative" when considering a motion for summary judgment). The court found "no direct evidence of discrimination apparent in Mr. Woods' statements." J.A. 602.

Nor did the district court find any circumstantial evidence of racial discrimination. The district court adopted the Third's Circuit's test in *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3d Cir. 2010), which established an analytical framework for § 1981 lending

11

discrimination claims. *Id.* at 264. The court found that the first two prongs of the *Anderson* framework had been satisfied—that BNT, as a minority-owned corporation, is a member of a protected class, *see Anderson*, 621 F.3d at 275; *Carnell Constr. Corp. v. Danville Redev. & Hous. Auth.*, 745 F.3d 703, 715 (4th Cir. 2004); *Woods*, 855 F.3d at 646, and that BNT applied for and was qualified for credit from the City. *See Anderson*, 621 F.3d at 275. But the court found that BNT failed to establish the third and fourth prongs—that the City's approval of the loan was subject to "unreasonable or overly burdensome conditions," and that "some additional evidence" established "a causal nexus between the harm suffered and [BNT's] membership in a protected class" from which the City's discriminatory intent could be inferred. *Id*.

Again, the only evidence BNT produced to show the City imposed "unreasonable or overly burdensome conditions" on BNT's loan was Woods' affidavit. And again, the court found these self-serving and uncorroborated and/or hearsay statements lacked probative value.

The district court found BNT's evidence similarly lacking on Anderson's fourth prong. The court concluded BNT did not provide any "additional evidence" that "establishe[d] a causal nexus" between the refusal to modify the loan's terms and BNT's membership in a protected class. *See Anderson*, 621 F.3d at 275. In doing so, the district court rejected BNT's argument that several nonminority-owned companies had received loans from the City where the City took a third lien position on the collateral. The district court found that the evidence BNT presented to show that other companies that received loans were "less deserving of credit" was not relevant to the question of whether BNT was

12

equally deserving of credit, or whether those businesses were less favorable borrowers. J.A. 606.

Moreover, the district court found that BNT did not stand on equal footing with the companies it identified. In those cases, the City had made loans to businesses through established loan programs. The loan BNT requested fell outside those programs. Furthermore, the court noted, none of the companies BNT identified was a "television company like BNT that provided false information to the City and sought to secure its loan with its owners' personal residence." And none of them "asked for resolutions to be amended immediately after they were passed and the Council then adopted new resolutions changing the initial loan terms." J.A. 608. These circumstances, the court concluded, along with Mr. Woods' self-serving, uncorroborated opinions about his and BNT's creditworthiness,[6] did not "establish[] a causal nexus between the harm suffered and [BNT's] membership in a protected class." J.A. 609. Absent any direct or circumstantial evidence of racial discrimination the court held that BNT failed to prove a case of Section 1981 discrimination and granted summary judgment to the City. This appeal followed.

---

[6] The court noted that Woods's statement that he was not given an opportunity to consolidate the first and second liens was false, as he was given notice that the loan remained available. Further, Woods offered no explanation for the information in the financial statement that the residence was valued at $1,100,000 and that it had only one mortgage in the amount of $509,000. His statement that, in essence, he assumed the City would accept a third lien on his residence as it had on the commercial property was not evidence of discrimination where his own financial statement indicated to the City that it would occupy a second, not a third lien position on the property. Lastly, Woods never explains why BNT was unable to execute the loan pursuant to the City's original term requiring a second lien position. Woods averred that they "easily" could have consolidated the first and second loans, but provides no facts to support this claim, including why he did not do so given his purportedly "excellent" credit. J.A. 604-05.

13

We review the district court's award of summary judgment de novo, considering the evidence and all reasonable inferences drawn from the evidence in the light most favorable to BNT. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Carnell Constr. Corp. v. Danville Redev. & Hous. Auth.*, 745 F.3d 703, 716 (4th Cir. 2004).

## II.

### A.

The Civil Rights Act of 1866 outlaws race discrimination in the making and enforcement of contracts. It gives "[a]ll persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The right extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

BNT claims the City violated § 1981 when it refused to adopt the amended resolution authorizing the loan under the proposed modified terms based on its status as a minority-owned company. As with other § 1981 claims, a plaintiff alleging discrimination in lending may prove a § 1981 violation by either direct or circumstantial evidence. *Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985). To prove a case of discrimination by direct evidence, a plaintiff must "produce direct evidence of a stated purpose to discriminate . . . of sufficient probative force to reflect a genuine issue of material fact." *Johnson v. Toys "R" Us – Delaware, Inc.*, 95 F. App'x 1, 6 (4th Cir. 2004) (unpublished)

14

(citing *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988)).  The district court concluded that BNT failed to present any direct evidence of discrimination, and neither party challenges the district court's finding here.[7]  Thus, we turn to BNT's proffered circumstantial evidence of discrimination.

## B.

Absent direct evidence of discrimination, this Circuit has applied the *McDonnell Douglas* analytical framework to the analysis of racial discrimination claims under § 1981. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (*McDonnell Douglas* framework applied to Arab-American plaintiff's racial discrimination in employment claim).  Under this framework, a plaintiff must "proffer sufficient circumstantial evidence" to establish a prima facie case of discrimination.  *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).  But here, we must determine the appropriate burden-shifting analytical framework applicable specifically to § 1981 lending discrimination cases.

### 1.

The Fourth Circuit has not yet considered a claim alleging racial discrimination in the terms and conditions of lending under § 1981.  Certainly, other circuits have taken

---

[7] We agree with the district court's conclusion.  Our review of the record, including Michael Woods' affidavit submitted in opposition to the City's motion for summary judgment, confirms that BNT failed to "produce [any] direct evidence of a stated purpose to discriminate . . . ."  *Johnson*, 95 F. App'x at 6 (quoting *Goldberg*, 836 F.2d at 848).  BNT has not identified any specific action or statement from which a factfinder could infer that a racially discriminatory attitude was the "but-for" cause of the City's decision.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

15

various approaches to the *McDonnell Douglas* burden-shifting analysis when it comes to lending discrimination. Here, the district court applied the Third Circuit's adapted version of the *McDonnell Douglas* framework set forth in *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273–75 (3d Cir. 2010). On appeal, BNT agrees that the *Anderson* analytical framework is the appropriate one and urges this Court to adopt its prima facie case of § 1981 lending discrimination, which does not rely on the use of comparators. It nonetheless argues that the district court erred in granting summary judgment. The City argues that this Court should instead extend its decision in *Williams v. Staples*, 372 F.3d 662 (4th Cir. 2004), which involved a § 1981 claim based on the defendant's refusal to accept an African American plaintiff's out-of-state check, to discriminatory lending cases. But even if we apply *Anderson* here, BNT has failed to make a prima facie case of discrimination.

Having considered the applicability of various burden-shifting frameworks utilized in the lending context, we conclude that the district court properly held that *Anderson* sets forth the nature of the showing to be made to establish a prima facie case in a § 1981 lending discrimination case.

2.

In *Anderson*, the Third Circuit held that a plaintiff who brings a Section 1981 racial discrimination in lending claim must show: (1) he "belongs to [the] protected class;" (2) "he applied and was qualified for credit that was available from the defendant;" (3) that the "application was denied or that its approval was made subject to unreasonable or overly burdensome conditions;" and (4) that "some additional evidence exists that establishes a

16

causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent." 621 F.3d. at 275.

Rather than apply a traditional burden-shifting test that requires a plaintiff to produce evidence that they were treated differently from "similarly situated" applicants, the *Anderson* court modified the "similarly situated" prong of the prima facie test. It reasoned that the plaintiffs should not be required to satisfy that prong as it has been articulated in the employment context because "requiring evidence of similarly situated individuals in the lending context would be overly burdensome" and "the parties would likely have considerable difficulty determining which applicants are similarly situated." *Id.* at 274. Instead, plaintiffs should "in some other way [be] able to show 'circumstances which give rise to an inference of unlawful discrimination.'" *Id*. (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

"We have repeatedly stated that comparative, or competitive, evidence is not a necessary component of a discrimination plaintiff's prima facie case." *Anderson*, 621 F.3d at 272. "Indeed, *McDonnell Douglas* itself did not require a showing as to 'similarly situated' individuals." *Id.* at 273. Its framework, "including the elements of a prima facie case, is intended to be flexible, subject to change to adjust for differing factual scenarios." *Best Med. Int'l, Inc. v. Wells Fargo Bank, N.A.*, 937 F. Supp. 2d 685, 697 (E.D. Va. 2013). And "[c]onsidering the fact that employment scenarios vary from those involving commercial lending, the Court finds it appropriate to adapt the *McDonnell Douglas* elements to better address the concerns here." *Id*. "Requiring plaintiffs to produce

17

comparative evidence in cases involving the lending process would not be productive due to the discrete and varying circumstances inherent in individual loan applications and approvals." *Anderson*, 621 F.3d at 273. "[G]iven the noncompetitive nature of the lending business—an applicant does not lose a loan to another applicant—comparisons among borrowers do not get to the heart of the matter. Moreover, requiring plaintiffs to ferret, and the bank to produce, evidence as to others with myriad different factual situations in order to find 'similar' borrowers, goes beyond what is required for a prima facie case." *Id.* at 272.

The district court found the Third Circuit's reasons for adopting a modified prima facie test for § 1981 lending cases persuasive and applied the *Anderson* test to the case at hand. The court was also persuaded by the opinions of other district courts within our Circuit that have applied the *Anderson* test in § 1981 lending discrimination cases. *See Best Med. Int'l.*, 937 F. Supp. 2d at 697; *Pitt v. First Tenn. Bank Nat'l Ass'n*, No. 4:17-CV-132-BO, 2018 WL 2391114, at *1 (E.D.N.C. May 24, 2018); *Flippings v. U.S. Home Mortg.*, No. TDC-15-4021, 2017 WL 728179, at *3 (D. Md. Feb. 23, 2017). We too find the rationale in support of this modified framework compelling and adopt the Third Circuit's test for establishing a prima facie case of discrimination in § 1981 lending discrimination cases.

In adopting the *Anderson* burden-shifting framework, we decline to extend this Court's decision in *Williams v. Staples*, 372 F.3d 662, to § 1981 lending discrimination

18

cases.[8]  In *Williams*, an African-American customer filed suit pursuant to § 1981 after the defendant store's employee cited a non-existent store policy as grounds for her refusal to accept the customer's out-of-state check as payment.  372 F.3d at 665.  The City contends that *Williams* applies to all § 1981 racial discrimination cases related to "the purchase of goods or services."  372 F.3d at 667.  Further, the City argues the Fourth Circuit's test in *Williams* for establishing a prima facie case of discrimination is applicable here because: (1) this Court has previously held that § 1981 claims follow the *McDonnell Douglas* burden-shifting framework and that the analysis never depended on the *type* of goods or services at issue; *see*, *e.g.*, *Guessous*, 828 F.3d at 216; (2) the *Williams* test requiring comparator evidence was already announced as the "law of the case" in this Court's previous opinion; *see Woods*, 855 F.3d at 650–51; (3) other circuits have required comparators even where the service at issue is lending; *see, e.g.*, *Ghosh v. Uniti Bank*, 566 F. App'x 596, 597 (9th Cir. 2014) (unpublished); and (4) this Court has required comparators for lending discrimination claims brought outside of the § 1981 context; *see Wise v. Vilsack*, 496 F. App'x 283, 285–86 (4th Cir. 2012) (unpublished).

    We do not find any of these arguments persuasive.  First, although *Williams* involved a § 1981 claim, it did not involve discrimination in lending.  And our reasons for adopting the *Anderson* burden-shifting framework capture the uniqueness of the lending context and

---

[8] To establish a prima facie case of discrimination under *Williams*, a plaintiff must establish that "(1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that are otherwise afforded to white customers." *Id.* at 667.

19

refute the need for comparator evidence. Moreover, the City's argument that this Court's prior decision made the *Williams* prima facie test "the law of the case" overstates the panel's prior holding. There, the issue was whether BNT's pleading was sufficient to withstand a motion to dismiss, not whether BNT had established a prima facie case of discrimination. *See Woods*, 855 F.3d at 648. Establishing a prima facie case is an evidentiary standard, not a pleading requirement. *Id.* at 646.

We also note that in an unpublished opinion involving an Equal Credit Opportunity Act ("ECOA") claim, we applied an Eighth Circuit prima facie test for lending discrimination cases. *See Wise*, 496 F. App'x at 285 (citing *Rowe v. Union Planters Bank of Southeast Mo.*, 289 F.3d 533, 535 (8th Cir. 2002)). We decline to apply that test here because, although *Wise* involved discrimination in lending, it did not involve a § 1981 claim. *Wise*, 496 F. App'x at 285. And as in *Williams*, its analytical framework depends on the availability of comparators.[9] *Id.* The *Anderson* burden-shifting framework on the other hand "addresse[s] the very particular question of lending discrimination claims under § 1981." *Best Med. Int'l*, 937 F. Supp. 2d at 696.

---

[9] Under that test, plaintiffs must prove (1) they are members of a protected class; (2) they applied for and were qualified for the extension of credit; (3) the lender rejected their application for credit despite their qualifications; and (4) the lender "continued to extend credit to others of a similar credit stature . . . ." *Wise*, 436 F. App'x at 285.

3.

Having established that *Anderson*'s analytical framework is applicable here, we consider whether BNT has made a prima facie case of lending discrimination under § 1981. We find that it has not.

BNT satisfies the first and second prongs of a prima facie case. BNT is a minority-owned company with an "imputed racial identity," and thus meets the first prong as a member of a protected class. *See Woods*, 855 F.3d at 646. And BNT applied for and was qualified for credit in the form of a loan from the City, at least under its original terms. Therefore, we turn our analysis to the third and fourth prongs.

As to the third prong, BNT argues that approval of its loan application "was made subject to unreasonable or overly burdensome conditions." *See Anderson*, 621 F.3d at 275. BNT contends the City insisted that its lien be in second position although it imposed a significant burden on BNT and provided no additional security over superior liens. Further, BNT asserts the City refused to remove conditions related to the Woods' commercial property even after the Woods' residence became the collateral for the loan. The City's initial approval of the loan, BNT contends, does not preclude a showing that the City discriminated against it when it refused to modify the loan conditions. The City refutes this, arguing that BNT's evidence is insufficient to show the conditions imposed were unreasonable or overly burdensome given the nature of the loan and the risk to be mitigated.

We note that BNT supported the Council's adoption of the Resolution, including the loan conditions with which it now takes issue, with full knowledge that the terms related to the City's lien position and the amount of indebtedness on the collateral could not be

21

met. These conditions were based on inaccurate information provided by BNT in its financial statement, which BNT did nothing to correct prior to the Council's June vote. After the existence of the second position lien came to light, the Council was required, as it had before, to decide on behalf of the City and its taxpayers whether to extend credit to BNT under the modified loan conditions based on the updated information now before it.

BNT claims the City's insistence on a second lien position was unreasonable, asserting that there was no difference between a second and a third lien position because there was sufficient equity in the collateral. But BNT's surface-level analysis ignores the realities of the risk involved in making the loan. The Council voted to approve the loan with the understanding that it would be secured by a $300,000 second position lien on a property they believed had $466,000 in equity. The proposed loan conditions would have required the City to loan $300,000 in exchange for a third position lien on a property with only $395,000 in equity. Although $95,000 in equity would have remained, this smaller amount made lien priority even more relevant, particularly in light of fluctuations in the residential real estate market and housing prices. Thus, the fact there was sufficient equity to cover the indebtedness does not lead to the conclusion there was no increased risk.

It was this risk that the Council evaluated, together with its continued concerns about making a loan outside of an existing economic development program, the speculative nature of the sitcom's revenue, the possibility that the City would be forced to foreclose on a personal residence if the sitcom was not successful, the fact that the jobs promised as a condition of the loan would be postponed, and its new concern that BNT had provided the City inaccurate financial information. Accordingly, we are not persuaded that Council's

insistence on a second lien position was unreasonable. Nor are we convinced that it was overly burdensome given the loan under its original conditions remained available to BNT for several months, and that Mr. Woods testified that "given time and opportunity . . . he could have arranged for the first and second mortgages on [his residence] to be consolidated . . . ." J.A. 193.

Next, BNT challenges the City's failure to remove loan conditions related to its commercial property. These terms—requiring an environmental site assessment and the assignment of the property's tenant leases to the City—were not included in the proposed amended resolution presented to the Council at its July meeting. But they remained in effect, along with the other original loan conditions, following the Council's July vote where it declined to adopt the amended resolution. BNT contends the Council, by leaving the terms in place, deliberately (and with animus demonstrated by the "contentious tone" of the meeting) imposed unreasonable and overly burdensome conditions. Assuming that the Council's July vote constituted an intentional imposition of these terms, we address each in turn.

BNT argues for first time on appeal that the environmental site assessment was an unreasonable and overly burdensome condition. BNT maintains, however, that it is not precluded from arguing facts related to the environmental site assessment in addressing this issue on appeal. But BNT's conclusory statements in its brief—that an environmental site assessment is costly, time-consuming, and, if negative, could impact the value of the property or expose property owners to potential liabilities—are not "evidence" that can defeat summary judgment. *Rountree v. Fairfax Cty. Sch. Bd.*, 933 F.2d 219, 233 (4th Cir.

23

1991) ("The arguments of counsel, absent any evidence such as sworn affidavits accompanying objections to a motion for summary judgment, fail to meet the evidentiary standard necessary to create a genuine issue of material fact."). At the same time, the City makes no argument as to why the condition was reasonable. We conclude then that even without considering BNT's unsupported allegations that requiring an environment site assessment was unduly burdensome, it may have been unreasonable to require an environmental site assessment on property that was not collateral for the loan.

The same cannot be said, however, regarding the lease assignments. We cannot conclude that it was unreasonable or unduly burdensome to continue to require their assignment to provide additional security for the loan. City staff repeatedly cautioned the Council regarding the level of risk, which increased when the City learned that there was additional debt encumbering the collateral that put the City's loan in third position and significantly reduced the amount of excess equity.

But even assuming that any of the loan conditions were overly burdensome or unreasonable, BNT has not presented any "additional evidence" that establishes "a causal nexus" between any harm suffered as a result of the imposition of the loan conditions and the company's imputed racial identity. *See Anderson*, 621 F.3d at 275.

BNT relies on two arguments in support of this prong. First, BNT maintains that the City's disparity study, which reveals the City contracted with a very limited number of minority-owned businesses, creates an inference of racial animus in the City's adverse actions against minority-owned businesses and is evidence of a systemic discrimination problem. By BNT's own admission, the study evaluated City contracts, not loans. Even

24

so, BNT insists the City's contracting record is not only relevant to its loan practices, but also can be used to infer racial discrimination in its dealings with BNT. Given the study's limited scope, we are not prepared to make that logical leap. We cannot conclude that a disparity demonstrated in one area of the City's dealings creates an inference of racial animus in another or with respect to a particular company. We have no evidence before us as to how the study would provide any insight into the reasons for the Council's decision.

Second, BNT contends that the tone of the Council meeting, and particularly the comments of Councilmember Wilkins, demonstrate racial animus. There is little dispute that Councilmember Wilkins did not support amending the loan conditions. But he was not alone. Indeed, most of the Council members' comments and questions—including Councilmember Wilkins' forceful ones—focused on the risks associated with the loan and the impact of the modified conditions. Nothing in their comments or demeanor, or ultimately in their disagreement with BNT's requests, creates an inference that their collective position on the matter was linked to racial animus. In sum, BNT has not presented any evidence that connects or otherwise creates an inference that the Council's decision to deny modification of the loan conditions was based on racial animus or discriminatory intent. Having failed to meet this fourth prong, BNT has not made a prima facie case of racial discrimination. It was therefore proper for the district court to enter summary judgment for the City on BNT's § 1981 claim.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

25

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Chief Judge Gregory's opinion in this case. As he well demonstrates, Greensboro's actions here were motivated not by discrimination but by a laudable desire to safeguard the soundness and solvency of its municipal budget. I do not understand the decision to suggest that comparator evidence is in some way disfavored in establishing a *prima facie* case of lending discrimination. Indeed such evidence will often strengthen a challenge to discriminatory lending practices. The lending decision is more likely to be unreasonable and burdensome if sound comparator evidence is offered than if no such evidence is adduced. With that understanding, I join the Chief Judge's good opinion.

26